## CARSTAIRS v. BOMAR et al.
### No. 2643.

Court of Civil Appeals of Texas. El Paso.
March 17, 1932.

Rehearing Denied April 14, 1932.

See, also 119 Tex. 364, 29 S.W.(2d) 334.

R. W. Hamilton, of Stanton, Whitaker & Peticolas, of El Paso, and Goree, Odell & Allen, of Fort Worth, for appellant.

Lea, McGrady & Edwards, of El Paso, J. M. Caldwell, of Midland, and Cantey, Hanger & McMahon, Mark McMahon, and Gillis A. Johnson, all of Fort Worth, for appellees.

WALTHALL, J.

Robert Carstairs brought this suit against W. P. Bomar and Mrs. Chloe A. Nail, as the independent executors of the will and estate of J. H. Nail, deceased, and Mrs. Chloe A. Nail, individually, Mrs. Jewell Ruth Bomar and her husband, W. P. Bomar, James H. Nail, Jr., Morris J. Stimson, Jr., and Elizabeth Stimson Burley and her husband, John A. Burley, and Mrs. Chloe A. Nail, as trustee under the will of J. H. Nail, deceased, for Morris J. Stimson, Jr., and Elizabeth Stimson, alleging that since the filing of the suit Elizabeth Stimson has married John A. Burley, and joins him as a party defendant.

We adopt as a sufficient statement of the matters involved in the suit, and the issues tendered therein, the statement of the nature and result of the suit in the trial court, as found in plaintiff's brief. It is substantially as follows:

"By his first amended original petition the plaintiff alleged in substance that he is the surviving husband and sole beneficiary and devisee of Elizabeth Nail Carstairs, who died May 3, 1927. Elizabeth Carstairs was a daughter of J. H. Nail and Addie Terry Nail, the first wife of J. H. Nail, to whom he was married on April 11, 1878, and who died June 20th, 1892. Addie Terry Nail was survived by two children, Celia and Elizabeth. After the death of Addie Terry Nail, J. H. Nail married Chloe Black (one of the defendants herein), on or about September 13, 1893. Two children were born of the second marriage, James H. Nail, Jr., and Jewell Ruth Nail, who married the defendant W. P. Bomar. J. H. Nail died on or about August 2, 1928.

"Plaintiff alleged that at the time of her death, Addie Terry Nail, the first wife of J. H. Nail, was possessed of a large separate estate as well as her interest in the community estate of J. H. Nail and herself, and that the estate of Addie Terry Nail was inherited by her two children, Celia and Elizabeth. Celia married Morris J. Stimson and died in September, 1920, leaving surviving her husband and two children, Morris J. Stimson, Jr., and Elizabeth Stimson who married John A. Burley. Elizabeth Nail married the plaintiff, Robert Carstairs, December 29, 1917.

"Addie Terry Nail died intestate, and about January 20, 1893, J. H. Nail filed in the County Court of Hunt County, Texas, his application to administer as survivor the community property of himself and his deceased wife, and was appointed such community survivor and filed an inventory, oath and bond. He did not qualify as administrator of his wife's estate nor as guardian of his two minor children, but continued to handle his deceased wife's separate estate as well as the community property, and to collect the revenues therefrom. In January, 1905, J. H. Nail undertook and purported to make a settlement with the two children of his first marriage and conveyed and delivered to them certain property, but did not make any accounting or settlement of the revenues, profits and increases of the separate estate nor of the community property, even though he had had the management of said separate estate and community property since the date of his first wife's death, and had collected the revenues and profits therefrom. That at the time of said purported settlement Elizabeth Nail was ignorant as to the kind, character and value of her properties and interest. That thereafter J. H. Nail continued to manage, handle and control the properties which he had conveyed to his daughter, Elizabeth Nail, in the purported settlement, and borrowed or used her money or properties in various transactions, which course of dealing continued until the year 1921. That prior to June 9th,

1921, the said Elizabeth. (Nail) Carstairs became informed and believed that the settlement which her father had made to and with her in regard to her mother's separate and community estate had not been a full and fair settlement, and that she had not been settled with nor received all the properties she was entitled to receive. That a dispute arose between her and her father in the year 1921, and she was threatening suit. That also, in handling her properties, J. H. Nail had borrowed from his daughter, Elizabeth Nail, and had used her money and properties in acquiring certain ranch properties and lands in Midland and Martin County, Texas, and after the acquisition of said land he had conveyed to his said daughter a part of the Midland and Martin County land. That about the time of his conveyance of the said land to his ·daughter, Elizabeth, J. H. Nail had promised and agreed that he would buy back said land.. That also with respect to said land a disagreement and controversy had arisen between him and his daughter, Elizabeth. In the early part of June, 1921, J. H. Nail went to El Paso, where his daughter, Elizabeth, resided, and as a result of their negotiations and conferences all matters in dispute between them were settled by the said J. H. Nail agreeing to carry out his agreement to repurchase said Midland and Martin County lands and to will and devise to his said daughter, Elizabeth Nail Carstairs, a ¼ part of his estate (after a certain special legacy to his son, James H. Nail, Jr.), and the said J. H. Nail then executed and delivered to his daughter, Elizabeth Nail Carstairs, a written contract as follows: .

" 'El Paso, Tex., June 9, 1921.

" 'Mrs. Elizabeth Carstairs,

" 'El Paso, Texas.

" 'Dear Daughter:

" 'I am handing you herewith a copy of my will which has been re-drawn and which is to be executed by me as soon as I reach Fort Worth.

" 'In this will you are left one-fourth (¼) part of my estate after a special legacy to my son, James H. Nail, Jr.

" 'As you have released me of the payment of the Five Thousand ($5000.00) Dollars, which sometime ago I obligated myself to you for, and to allay all friction between us, I assure you this will shall be carried out as far as you and Celia's children are concerned, and at my death you will receive your one-fourth (¼) part of my estate.

" 'Your father, J. H. Nail.'

"That in keeping with said agreement J. H. Nail caused to be prepared his will which he executed, wherein after certain special bequests he devised to his daughter, Elizabeth Carstairs, ¼ part of his estate as he had agreed and contracted to do.

"That the disputes and controversy theretofore existing between Elizabeth Nail and her father were settled and adjusted and she abandoned the institution of any suit and released the said J. H. Nail from the payment of the $5,000.00 referred to in said agreement, and that she did not then or thereafter institute or prosecute any suit for the recovery of any properties or moneys due her by the said J. H. Nail. That by the terms of said agreement and contract the said Elizabeth Nail Carstairs became vested with the right to and entitled to receive a ¼ part of the properties owned by her father at the time of his death, less the special bequest referred to in said contract and the accompanying. will. That under the terms of the will of the said Elizabeth Nail· Carstairs the plaintiff herein as her sole devisee became vested with all of her rights under the contract and agreement of the said J. H. Nail, above set out. That·upon the death of the said J. H. Nail, which occurred August 2, 1928, plaintiff became the equitable owner of and entitled to ¼ interest and part of all of the properties of the said J. H. Nail at the time of his death, except the special bequest reserved in said contract and agreement of June 9, 1921, and the accompanying will. The properties of the said J. H. Nail are set out at length in the petition, and include lands located in Martin County, Texas, and in other counties in Texas, as well as personal property.

"Plaintiff further alleges that after the execution of the above mentioned agreement on June 9, 1921, and of the will therein referred to and in violation of said agreement, the said J. H. Nail made another will which has been admitted to probate, and under the terms of which the said J. H. Nail attempted to devise all of his properties to the defendants in this suit. That the defendants hold in trust for the plaintiff the ¼ part of the estate of the said J. H. Nail to which Elizabeth Nail Carstairs was entitled under the terms of the agreement and contract entered into by and between her and the said J. H. Nail, on June 9, 1921.

"Plaintiff prayed for a discovery and ascertainment of the properties owned and possessed by the said J. H. Nail at the time of his death, and that plaintiff's equitable title to ¼ thereof be established, and that legal title be divested out of the defendants and invested in plaintiff as to said ¼ interest, and that said property be partitioned between and among the owners thereof as provided by law, and he prayed for general relief.

"The defendants answered by special exceptions, general denial and special pleas by which they asserted that J. H. Nail had made a full and fair settlement with his daughters of all properties inherited by them from their mother. That he dressed his daughters in finest fashion, educated them, and that his daughters showed the greatest love toward him until Elizabeth married the plaintiff, when her attitude changed. That he ad-

vanced to Elizabeth large sums of money, to-wit, about $47,000.

"That in the spring of 1921, Elizabeth Carstairs owned 7 sections of land in Martin and Midland Counties which she desired to sell and which J. H. Nail finally agreed to purchase at $12.50 an acre, a price in excess of the value of said land at the time. Prior to May 1, 1921, because of the financial conditions then existing and heavy losses which he had sustained, the said J. H. Nail sought more time to complete said purchase. That his daughter, Elizabeth, employed attorneys at El Paso to force the said J. H. Nail to complete said purchase and threatened suit unless he consummated the purchase, and thereafter the said J. H. Nail went to El Paso and engaged in conferences with his daughters which lasted approximately five days, and finally the said J. H. Nail agreed to complete the purchase of said land. That in such conferences Elizabeth was guilty of abusive language toward the said J. H. Nail.

"That the daughter, Elizabeth Carstairs, owed a filial duty to her father not to quarrel with him nor to cause friction with him or his family. That shortly after the said J. H. Nail returned from El Paso she again, in concert with and at the instance of plaintiff, renewed her abuse of her father, and her unnatural conduct toward him and his family, and made the claim that said J. H. Nail had not fully accounted to her for her interest in her mother's estate as a pretext to force him to make immediate delivery to her of all property she would inherit from him in case she survived him; that both plaintiff and said Elizabeth knew that said claim was wholly false and groundless and that same was not made in good faith; that she continued such threats and mistreatment until her death.

"And further that the instrument of June 9, 1921, was without consideration, and the consideration therefor failed, in that the $5,000 therein mentioned was not owing by the said J. H. Nail, and he was under no legal obligation to pay same; that he had theretofore promised to give Elizabeth $15,000 with which to build a home and had paid of said sum $10.000, but becoming desirous of not building said home, asked her father to release her from buying or building such home and permit her to retain said sum of $10,000 on condition that she would not ask nor expect the remaining $5,000, but would release him from such obligation, all of which was agreed to. That long prior to June 9, 1921, the said J. H. Nail had been giving his daughter money at various times, but she continued to abuse and threaten him, etc., and that the term 'to allay all friction between us,' did not import or constitute any consideration in that it was the duty of Elizabeth Nail to allay all friction and to treat her father with kindness and respect.

"It was also alleged that the said instrument of June 9, 1921, was obtained by duress, force and threats, and that on June 9, 1921, the said Elizabeth Carstairs did not intend to cease her abuse and mistreatment of her father or to be bound in any particular by such instrument. That the settlement was made with Elizabeth in 1905 of her interest in her mother's estate, and she had acknowledged receipt of the full share of her mother's estate in writing and was estopped to deny the fact that a complete settlement had been made. That she breached all of the terms and conditions of the instrument of June 9, 1921, and began to engage in and continued until the time of her death, a course of conduct unnatural toward her father. And that thereafter the said J. H. Nail executed his last will and testament bequeathing his property to the defendants in this suit, which will was duly probated, and in which he disposed of his property free and clear of any agreement or trust in favor of the plaintiff.

"That the contract of June 9, 1921, was abandoned.

"That said contract of June 9, 1921, was by its terms and in fact personal to Elizabeth Carstairs and solely for her benefit, and subject to both the express and implied conditions that if she should die before the said J. H. Nail should die, the obligation of said contract should cease and terminate.

"Plaintiff filed a supplemental petition in which he urged various special exceptions to the answer of the defendants, which exceptions will be set out more at length under appropriate assignment of error. In addition to his general denial, plaintiff specially denied that he caused any trouble between J. H. Nail and his daughter, Elizabeth, and pleaded affirmatively that there was no difference of any moment between J. H. Nail and his daughter until she discovered that she had not received a full and fair settlement of her portion of her mother's estate. He denied specifically that J. H. Nail was induced to sign the contract and agreement of June 9, 1921, by any duress, force and threat of Elizabeth Nail Carstairs, her attorneys or plaintiff. That said J. H. Nail executed said instrument of his own free volition in order to effect a settlement with his daughter and to avoid the suits which she had proposed to institute to enforce her legal rights. He further alleged that after the execution of said instrument and after J. H. Nail had returned to his home at Fort Worth and was far removed from his daughter, the plaintiff or her attorney, and when he was among his friends, advisors and relatives, he fully ratified and affirmed the said contract and agreement and voluntarily executed the will referred to in said agreement and by writing a letter to his daughter expressed his full satisfaction with said contract and agreement.

"Plaintiff also specifically denied that Elizabeth Carstairs first asserted that her father had not fully accounted to her for a fair interest in her mother's estate in August, 1921, and alleged affirmatively that Elizabeth Carstairs had asserted her claim prior to June 9, 1921, and had employed an attorney with a view of prosecuting her causes of action against her father to determine and establish her rights. That any further differences between Elizabeth Carstairs and her father were provoked and justified by an extremely derogatory and slanderous accusation made by her father against the mother of said Elizabeth Carstairs after the execution of the agreement on June 9, 1921. That Elizabeth Carstairs accepted and relied upon the instrument and contract of June 9, 1921, and was thereby induced to refrain from prosecuting any cause of action she may have had, and that defendants were estopped to deny the validity of said contract inasmuch as James H. Nail had received the full benefits of said instrument and of the considerations supporting same.

"At the conclusion of the evidence the plaintiff requested a peremptory instruction in his favor, which was refused and the Court peremptorily instructed the jury to return a verdict in favor of the defendants, and a verdict was returned pursuant to such direction, upon which a judgment was rendered in favor of the defendants on 13th day of June, 1931."

From which judgment plaintiff duly prosecutes this appeal.

### Opinion.

We will designate the parties as plaintiff and defendants, as in the trial court.

This is the second appeal of this case. On the former appeal the case was certified to the Supreme Court on a question of venue. 119 Tex. 364, 29 S.W.(2d) 334, 338.

The case is extremely lengthy, the statement of facts covering more than one thousand pages of the record, and in addition thereto some one hundred exhibits.

As pertinent to his assignments of error plaintiff submits two propositions of law, the first being copied from an expression used by the Commission of Appeals, Section A, on the former appeal, adopted by the Supreme Court, and ordered certified.

The propositions are as follows:

First. "Where one, for a valuable consideration which is performed by the promisee, promises in writing to devise his property to the latter, and the promisor dies without carrying out his promise, equity regards that as done which ought to have been done, and corresponding relief will be administered to the promisee. If the promisor leaves a will devising his property to others, in violation of his promise, the property becomes charged in their hands with a constructive trust in favor of the promisee as beneficiary. The devisees take the legal title as trustees in invitum, for the use and benefit of the promisee and his privies. The beneficial interest of the promisee or his privies constitutes an equitable title upon which an action, in the courts of this State, for the recovery of the property may be founded."

Second. "The proof having shown conclusively that J. H. Nail for a valuable consideration promised in writing to devise ¼ of his property to Elizabeth Carstairs, and the plaintiff as the sole devisee of Elizabeth Carstairs having succeeded to her vested rights under said contract, was entitled to recover in this suit ¼ of the property owned by J. H. Nail at the time of his death."

Following the second proposition, plaintiff quotes largely from the evidence upon which he relies to recover the interest sued for in the property.

As briefly as we may state it, the following appears:

"El Paso, Tex., June 9, 1921.

"Mrs. Elizabeth Carstairs,

"El Paso, Texas.

"Dear Daughter:

"I am handing you herewith a copy of my will which has been re-drawn and which is to be executed by me as soon as I reach Fort Worth.

"In this will you are left one-fourth (¼) part of my estate after a special legacy to my son, James H. Nail, Jr.

"As you have released me of the payment of the Five Thousand ($5000.00) Dollars, which sometime ago I obligated myself to you for, and to allay all friction between us, I assure you this shall be carried out as far as you and Celia's children are concerned, and at my death you will receive your one-fourth (¼) part of my estate.

"Your father, J. H. Nail."

The will referred to in the above instrument, after providing, in item 4 thereof, for the special bequest to James H. Nail, Jr., certain items therein mentioned, contained the following provision: "Item Five: All the remainder of my estate, after the special legacy in Item Four, given to my son, I give, devise and bequeath as follows: To Elizabeth Carstairs, of El Paso, Texas, my daughter, one-fourth (¼) part of my estate."

Referring to the will mentioned in the above letter of June 9, 1921, J. H. Nail wrote his daughter Elizabeth as follows:

"Albany, Tex., June 16, 1921.

"Dear Daughter:

"I signed the will this morning and made Joe M. Reynolds joint executor with my wife. Joe B. Matthews and Merick Davis witnessed it, and I am sending to the Ft.

Worth Nat'l Bank just as soon as I can go down.

"Don't you ever get it into your head that I will ever disinherit any child I have got no matter what they do or what influence is brought to bear against me. ·

"Tell old Bob Carstairs that I am in love with him and think him my friend and a very high class gentleman and I want him to come to see me sometime if not to Ft. Worth to the Ranch.

"With much love for you both, I am your Papa,

"J. H. Nail."

With respect to the settlement of June 9, 1921, Elizabeth Carstairs wrote her father as follows:

"1019 Mundy Avenue, El Paso, Tex.
"June 15, 1921.

"Dearest Papa:

"The more I think of the settlement we made when you were here, and the letter you wrote me assuring me that you would not disinherit me and that I would get my one-fourth part of the estate, the more pleased I am with it, and I want to say that I accept it very gratefully. It is also a great source of comfort to me to have been assured by you in the same letter that the settlement you and Celia had before her death in regard to the inheritance of her children will be carried out by you, and that little Morris and Elizabeth will come in for their joint one-fourth part of your estate. * * * With love to you from us both, I am, as ever,

"Your devoted daughter, Beth."

On June 18, 1921, J. H. Nail wrote plaintiff a letter of appreciation for some matters plaintiff had attended to for him, not important here, and in which letter he said: "Bob, you must be a great peace maker, you made peace between me and Beth for which I thank you from the bottom of my heart and hope to know more of you and claim you for my son and friend."

On July 21, 1921, J. H. Nail wrote Elizabeth Carstairs as follows:

"Dear Beth:

"Your letter telling me that you was happier now over my letter to you about your inheritance was received four or five days ago and it did me lots of good and made me feel happy for I never had any thought of making any difference in any child I have so believe all I tell you as far as I can I shall never see or know any preference in any of you."

It is undisputed that J. H. Nail went to El Paso early in June, 1921, for a conference with Elizabeth Carstairs. On May 26, 1921, he wrote her as follows:

"Dear Daughter:

"I want you to stop the talk if you can about you going to law me. The news of this trouble between you and I is spreading all over the country from El Paso to Dallas. It comes to me by rank strangers from El Paso and must have come from you or your lawyers. Someone is spying on me here (Fort Worth). * * * I wrote Mr. McGrady and told him to get you and your lawyers together and figure up the deal according to the statement that I sent him, and make out deed and send to the Fort Worth National Bank and that I would sign notes and send the bonds to you. I want you to do this and let us stop this matter. It is an honest statement backed up by the deed and is just how the matter stands between us, so you close it up and let me have some peace. I will deed your land back to you any time within five years from your deed to me provided you will hold it another five years in your own name at Eleven ($11.00) Dollars per acre, and you can keep this letter in evidence and show it to your counsel and ask him if it is not a fair proposition. * * * Beth, I am getting up a statement of my affairs and am going to write you a long letter some day telling all and the whole truth, not with any hope of banishing your feeling toward my second family for this would be sheer folly, but in justification to myself to the charges you make of me toward you and Celia's children. My family here know little of our trouble and they shall never know from me.

"Love to you and Bob, I am your Papa,

"J. H. Nail."

J. H. Nail came to El Paso and had conferences in Judge Peticolas' office, lasting several days, culminating in the agreement of June 9, 1921. As to what occurred in the conferences Judge Peticolas testified:

"I first became acquainted with J. H. Nail in June, 1921, at which time he visited my office. He was in conference with Mr. and Mrs. Carstairs and myself early in June, 1921, and while I can't be exactly accurate I think we had from three to five conferences. My recollection is that they would come in today, we would confer all morning, then they would come in maybe in the afternoon or maybe the next day. They were separate conferences over four or five days starting sometime the early part of June, 1921. The first conference was the first time I had met Nail. Our offices at that time were four rooms, a reception room and three private offices, one of which was mine. We had some more or less desultory conversations in the front office but the conferences between Mr. Nail and Mr. and Mrs. Carstairs and myself took place in my private office. There was no attorney for Mr. Nail present at any time.

"Q. Who did most of the talking as between Mr. Nail and his daughter? A. To give you an accurate idea of what occurred: Mr. Nail and Mrs. Carstairs were very much wrought up at these conferences. The con-

ferences were very distressing and embarrassing to me because the parties indulged in mutual renunciations, accusations, profanity. weeping,—a regular cat and dog fight each time they met.

"Q. Judge, the question I asked was which did most of the talking? A. The answer I make to that exactly, Mr. McMahon, is that it is impossible to say.

"Q. What was her attitude towards her father as to being abusive or kind? A. She was abusive at times.

"Q. I will ask you if during these conferences she didn't become abusive and Mr. Nail didn't sit there and cry and say nothing? A. He did sit and cry a great deal, but he nearly always said something.

"Q. He cried a great deal during each of the conferences when she would be abusive to him, didn't he? A. Yes, he cried a great deal.

"Q. Judge, in the suit brought I don't know what particular attorney prepared the petition, but the allegation is made that a written instrument or contract was executed, but the document is not set out. Was a letter or statement of any kind signed by Mr. Nail in your office? A. Yes, sir.

"Q. Do you have, or do you have access to the original? A. I can't give you the original because Mr. Carstairs has got it locked up in his safety deposit box, but I have brought a photostatic copy which I can give you."

He further testified:

"I think I must have written the letter on the typewriter myself, because the stenographer's initials, which are generally attached to a document they write, do not appear. I do frequently write short documents, especially if I have any reason for not wanting the stenographer to see it. My recollection is that I wrote this letter on the typewriter myself. I have a copy of that will that is referred to in this document. I have copies of two or three wills, but without referring to the copy that's attached to the original document I can't be absolutely certain that I give you the correct one, but I think this is it. It is dated June ———, 1921. I have no other copy of the will which was dated in 1921. At that time Mr. Nail told us that he had not yet executed the will, that he had not decided who his executors were to be, and the will was to go to Ft. Worth to be executed and a copy of it be sent back to Mrs. Carstairs. That is my recollection of how it was. The copy of the will was not mailed back to me. I think Mrs. Carstairs brought it in to my office. I would say that she brought it in shortly after this document was executed, I don't know just how long. Let's get this clear, gentlemen: There is attached to the original document which Mr. Carstairs has in his safety deposit box a copy of a will. That copy was brought to our office and from

it we made this copy. I feel sure that the copy I hand you is an exact copy of the one attached to the original document but I must necessarily limit that statement because I have not before me the other copy at this moment.

"Q. The $5,000.00 referred to in the letter was part of a $15,000.00 gift Mr. Nail was giving Mrs. Carstairs for the purpose of building a home, was it not? A. Mr. Nail had agreed to give her $15,000.00, as I understood it, and had only given her $10,000.00.

"After the date of the letter I think Nail left town.

"Q. Judge, I believe you said that from their conversation you learned that he had previously agreed to give her $15,000.00 and had only given her $10,000.00, is that correct? A. Yes sir.

"I understand that the $15,000.00 promised Mrs. Carstairs was to build a house or home. I do not know how long previously the $10,-000.00 had been given to her before this meeting, but their statement was that he had previously promised to give her $15,000.00 to build her a house or home, and had actually only delivered to her $10,000.00.

"Q. Judge Peticolas, you have been interrogated about certain conversations which took place in your office in June, 1921, at which discussions took place between Mrs. Carstairs and her father Mr. Nail. Whom were you representing in these conferences? A. Mrs. Carstairs, or Mr. and Mrs. Carstairs as a matter of fact.

"Q. What was the substance of these conferences that you had at that time? A. We had up four matters: the question of the $5,000.00—

"We had up four subjects: the original $5,000.00 in connection with the house; the claim of Mrs. Carstairs against her father for not having truly accounted to her for her interest in her mother's estate; the question of whether he would purchase certain lands which he had agreed to purchase from her, and the question of whether she should remain as a beneficiary in his will.

"Q. What claim, if any, was Mrs. Carstairs making at that time to her father in regard to the settlement which he had made with her and her sister of her deceased mother's estate? A. She claimed that he had settled with her on the basis that the property was community property when it was really her mother's separate property. She also claimed that the valuation placed in the inventory on the assumption that the property was community property was much less than the value of the property and she claimed further that the property which he conveyed to her in satisfaction of her community interest she did not really get.

"Q. Were these claims that you say she was making, asserted and made to Mr. Nail in

these conferences?' A. They were not made as clearly and distinctly as I have stated them, but took the form of accusations by Mrs. Carstairs that he hadn't conveyed to her what he should have conveyed to her; that he had under-valued the property, and that, to use a colloquialism, he beat her out of her property.

"Q. What was she endeavoring to do in these conferences, so far as you could determine, Judge? A. She was endeavoring to get him to buy her land, to make sure that she was not disinherited, and as the conferences went on the parties got in a very much better humor towards each other and stated that were settling everything.

"Q. State as, near as you can substantially all that was said and done by Mrs. Carstairs and her father in said conferences leading up to the execution of this instrument about which you have been interrogated? A. As nearly as I can state it with exact accuracy after this lapse of time, the first question that was discussed was whether Mr. Nail would carry out his agreement to purchase her land. In connection with that she used as an argument that he had never truly accounted to her for her part of her mother's estate. I do not recall with exactness how the question of her rights in the will was injected into the conversation but she was claiming that he had not treated her right in the settlement of her mother's estate, that he had not paid her the $5,000.00 he owed her, and that he had not bought her land, and went on to state something to the effect, 'I reckon the next thing you will do is to cut me out of your will,' or words to that effect. Mr. Nail seemed very sensitive to the accusations about the community estate and they discussed those matters pro and con for three or four conferences. He assured her that he would not cut her out of his will and he finally agreed to buy the land, and I think at my suggestion he agreed to execute a document with reference to the will.

"Q. What, if anything, was said between the parties at that time in regard to whether this was or was not a settlement between them, and if so, of what? A. They said it was a settlement of everything.

"Q. Who said that? A. Both of them.

"Q. Do you remember what occasioned the typing of this document by you? A. You mean the letter?

"Q. Yes, the letter of date June 9th, 1921. A. When Mr. Nail said that he wouldn't cut her out of the will I think I suggested that he had better put it in writing.

"Q. Did you see J. H. Nail sign the letter of date June 9th, 1921? A. I have no distinct recollection about that but I do know that he either signed it when I wrote it, or he took it out and brought it back signed.

"Q. To whom did he deliver it after it had been signed? A. To Mr. or Mrs. Carstairs right there in the office.

"Q. Were you present when it was delivered? A. Yes.

"Q. What was said and done by Mrs. Carstairs and Mr. Nail after the letter was delivered? A. I can't answer that accurately further than they had all gotten in a good humor and were mutually felicitating each other about having cleared up their differences.

"Q. Do you know whether or not Mr. Nail was acting on advice of counsel during the time that these negotiations were going on? A. I only know that: that he went to Judge McGrady's office—what took place in that office I don't know.

"Q. That is Judge J. G. McGrady, of the firm of Lea, Edwards, Thomason & McGrady? A. Yes.

"Q. What was said in said conferences about which you have been interrogated about the buying of the land? A. Mrs. Carstairs said to Mr. Nail that he had agreed in writing to buy her land. Mr. Nail did not seem to particularly dispute that he had agreed to buy the land, but apparently wanted to put it off on the ground that he didn't have the money at that time, or something of that nature, but finally said he would take it.

"Q. What did they do then with reference to the buying of the land? A. Mr. and Mrs. Carstairs executed a deed to Nail, he executed the notes and gave an order on a Fort Worth Bank for $10,000.00 in Liberty Bonds, which was to be the cash payment, and we sent the deed down to the Bank to be delivered when they sent us the Liberty Bonds. I am a little bit hazy about just the immediate details of how we handled the notes, but I think they were escrowed, sort of, with us.

"Q. What did Mr. Nail and Mrs. Carstairs say in regard to the $5,000.00, about which you have been interrogated? A. She said will you pay me what you agreed to pay me, and he finally said well he would pay it, that's about as near as I can give it to you.

"Q. That was the $5,000.00? A. Yes.

"Q. What was finally done about the payment of the $5,000.00? A. She relieved him of it.

"Q. What was said by them in regard to the community estate of Mrs. Carstairs' mother? A. Your question covers a good deal of ground. They had discussed the community estate claim pro and con, using rather violent and unkind language towards each other, for two or three meetings. It is not in the nature of things possible for me to state all that was said about it, but the conclusion was, as I understood it, that she was to relieve him of any claim against him by reason of the community estate and in con-

sideration of that, and the other factors that we have discussed—

"Q. In your previous answer you say that those certain things were in conclusion. What do you mean by the word 'conclusion'? A. The idea I am trying to convey is that they had discussed and fought over all of these matters for three or four days. The negotiations, at times, apparently broke completely off, and after they had so discussed it for three or four days, along towards the termination of these conferences, they agreed to the things that I have mentioned; that he would buy the land, that she would relieve him of the $5,000.00, that he would give her the document about leaving her in his will, and that it should settle the community estate matter.

"That was the substance of the conferences.

"Q. Judge, in these conferences I will ask you if she was very abusive to Mr. Nail and if he didn't just sit there and cry and say nothing, during every conference they had. A. She was very abusive to Mr. Nail and he cried a great deal but he was talking a great deal, too.

"Q. You represented Mrs. Carstairs and her husband on down through her death in legal matters and questions that came up during the rest of 1921 and 1922 you were their attorney, were you not? A. Yes, the firm was.

"Q. That's what I mean, but I thought you personally handled most of it didn't you, if not all? A. I handled a good deal and I think Mr. Whitaker handled some too.

"Q. Now this $5,000.00, you, as a matter of fact, know that he actually gave her the $5,000.00 later don't you? A. No.

"Q. You didn't know about that? A. No.

"Q. You have heard her say that, haven't you, that he had paid her the $5,000.00? A. No, I haven't.

"Mr. Gammill: Judge, Mr. McMahon has asked you about whether or not Mrs. Carstairs abused Mr. Nail and Mr. Nail cried. Did Mr. Nail talk back in spite of his crying? A. Yes.

"Q. To put it in common language, did he hold his own? A. That's a very hard question to answer, but I would say that Mrs. Carstairs' emotions seemed to come out in abusive language and Mr. Nail's emotions seemed to come out in tears. Both sides were very much wrought up. Mrs. Carstairs was, perhaps, more abusive than Mr. Nail but at times Mr. Nail was also abusive."

In a business and advisory letter of date October 9, 1914, written by J. H. Nail to Mrs. Carstairs, which we copy only in part, he says: "You put in all the money you can in the deal. It will be all right, if you are not satisfied I will take it off your hands."

Mr. Ed. M. Whitaker, one of Mrs. Carstairs'

attorneys, testified in substance that he wrote her will in February, 1921; that in May, 1921, she placed in his hands two matters, one relating to her contract with her father wherein he agreed to buy her Martin and Midland county land, the other that she had reason to believe that the settlement her father had with her and her sister in 1905 in the matter of her mother's estate had not been a fair settlement; that she brought with her a copy of a will which she claimed was made by her father in 1919 (the copy of the will was admitted in evidence); that to make an investigation of her claim, witness, on May 18, 1921, wrote to the county clerk of Hunt county making inquiry whether J. H. Nail had qualified as survivor of said estate and requested a copy of the inventory filed in the probate court. Without stating it, the record shows the result of the inquiry in Hunt county. The record shows that on May 26, 1921, J. H. Nail wrote the letter to Mrs. Carstairs we have copied, beginning: "I want you to stop the talk if you can, about you going to law me."

Without quoting from testimony of the witnesses on the trial of this case, it is evident that Mrs. Carstairs was not satisfied with the settlement made with her father in 1905. We need not go into that settlement; the point being, as we understand it, that the settlement of 1905 was a part of the "friction between us," which the parties sought to "allay" and which was allayed in their conferences ending on June 9, 1921.

Based on the correspondence stated, the evidence of Judge Peticolas and others as above, plaintiff submits propositions to the effect that the evidence being undisputed, the trial court should have instructed a verdict in his favor; that the contract of June 9, 1921, imports a consideration and that the burden is on defendant to show a want of consideration, and having failed to do so the jury should have been instructed to find for plaintiffs; that a release of a specified claim or obligation as in the contract of June 9, 1921, is contractual in its nature and cannot be varied by parol testimony, and such being true the verdict should have been instructed for plaintiff; the term "to allay all friction" occurring in the contract of June 9, 1921, was incomplete, in that it did not show on its face to what the friction related, it was permissible for the witness to explain what the friction related to, and in what manner it was allayed; it is immaterial in determining the validity of the contract of June 9, 1921, whether the settlement made by Nail with his daughters in 1905 was fair or not, it being undisputed and certain from all the facts and circumstances in the evidence that she believed in good faith that she had been overreached in the settlement, and the fairness of such settlement will not be inquired into.

Before discussing the questions presented, some facts incidentally referred to, but not clearly stated, might be more clearly stated.

Elizabeth Carstairs was the daughter of J. H. Nail, and at all times mentioned here was the wife of plaintiff. Elizabeth Carstairs left no child, and made a will by which she gave and bequeathed all of her property of every kind to her husband, plaintiff here, and in the will appointed him sole executor of her will without bond. The will was duly, probated in the county court of El Paso county. At the time of writing the letter of June 9, 1921, J. H. Nail was near seventy years of age. He had been married twice. His first wife, the mother of Celia and Elizabeth, died in 1893. In 1905 J. H. Nail made a settlement, referred to in the record, with his two daughters, Celia and Elizabeth, as to the property they might have inherited from their mother. After the death of his first wife Nail married his second wife, Chloe A. Nail, one of the defendants, to which union were born Jewell Ruth Bomar and James H. Nail, Jr., defendants here. Celia Stimson died in 1920, leaving two children, Morris J. Stimson and Elizabeth Stimson, now Mrs. Burley. The successive wills of J. H. Nail always provided for Elizabeth Carstairs in the same proportion as the other children, until after her death, when he changed his will and made the other three share alike. Mrs. Carstairs died in 1927, and J. H. Nail died in 1928.

The legal effect of the contract of June 9, 1921, between J. H. Nail and Mrs. Elizabeth Carstairs, was fairly well before the Supreme Court on the former appeal of this case. The only real difference we see is that the evidence as to the consideration for the contract as to the $5,000, and the evidence showing the consideration implied in the term "to allay all friction between us," was not before the court. It is true also that the primary question before the court on the former appeal was that of venue. The Supreme Court had for its consideration, as shown by the certificate, the plaintiff's petition as here, though not the form or verbiage of the contract, as shown in the evidence.

However, assuming that a valuable consideration for the contract is shown by the evidence on the trial, it would seem that the legal effect of the contract, as a contract, would be as stated in the Supreme Court's opinion on the former appeal in this case. It is there said: "Where one, for a valuable consideration which is performed by the promisee, promises in writing to devise his property to the latter, and the promisor dies without carrying out his promise, equity regards that as done which ought to have been done, and corresponding relief will be administered to the promisee. If the promisor leaves a will devising his property to others, in violation of his promise, the property becomes charged in their hands with a constructive trust in favor of the promisee as beneficiary."

A similar holding to that above is made in Jordan v. Abney, 97 Tex. 304, 78 S. W. 486, 489. In that case there was a verbal contract to adopt, and also to leave property at death. In discussing the question presented, Judge Williams, speaking for the court said: "This is the real question in the case. That a contract between two persons, upon valuable consideration, that one will, at his death, leave property to the other, is enforceable, where no statute is contravened, is held by an almost unbroken current of authority, English and American. Such contracts, when sufficiently certain, have been held valid and enforceable, in equity as well as at law, whether they provide for the payment of money, or the leaving of specific property, or of all or a moiety of that which the obligor should leave at his death. They have usually been put in the form of agreements to bequeath by will, but this has not been regarded as an essential feature; agreements to leave the property or that the obligee should have it at the death of the obligor, being held sufficient." See, also, Page on Wills, § 107 p. 192.

We have concluded that the equitable title pleaded by the plaintiff presents a legal basis for the direct recovery of the undivided interest claimed by plaintiff as the successor in right to his deceased wife, unless such title and right is defeated by some of the defensive matters presented as such want of consideration, or was rescinded, or that the promise was personal to Mrs. Carstairs and lapsed at her death, as contended by defendants. These several points of contention are:

Defendant submits that the letter of June 9, 1921, relied on as a contract, shows that the bequest was personal to Elizabeth Carstairs and lapsed on her death; that it was merely an agreement not to disinherit as distinguished from a contract to bequeath, and refers to article 8295 of our statute.

As we construe the article of the statute it does not, by its terms, provide that a devise shall lapse, as suggested by defendants, if the devisee during the life of the testator dies without leaving children; the article states the circumstance under which the devise will not lapse, but makes no statement of circumstances under which the devise will lapse. We think the article has no application.

Plaintiff submits that his suit is based on the contract expressed in the letter of June 9, 1921, and not on the will; that it is the contract, and not the will, from which the rights flow; that it is the contract that is irrevocable. Defendants contend that where the legacy in the will is obtained or amounts to a purchase such devise would not lapse, but contend where the devise was not by purchase it would lapse, though it was for a

consideration. Defendants further make the contention that the letter of June 9, 1921, on its face provides for a bounty, and only what Mrs. Carstairs would inherit under the law had no will ever been written; that by the terms of the will, made a part of the contract, it appears she was to get a child's part, no more, no less; that no reference being made to her husband or a gift over to anybody else, the devise in the will was personal to Mrs. Carstairs, and impliedly conditioned that she should be alive at his death, such implication appearing in the letter in the term, "I assure you this will shall be carried out as far as you and Celia's children are concerned, and at my death you will receive your one-fourth part of my estate"; that the letter and the will show that the children of J. H. Nail are to take of his estate by inheritance; and that the promise in the letter and the will taken together is not to disinherit, and no more.

We have sufficiently quoted the undisputed evidence to show the matters at issue and dispute between Mrs. Carstairs and J. H. Nail at and prior to their several days conferences in the office of Judge Peticolas, and which conferences resulted in the writing of the letter of June 9, 1921. It is apparent that at that time the will had already been drawn and was later to be executed. It is also apparent that the matter of disinheritance came up incidentally and was only a part of the matters in controversy between father and daughter, and formed no part of the expressed consideration in the letter for his assurance that the will he exhibited would be carried out, and that Mrs. Carstairs would receive one-fourth of his estate at his death. The question as to what she would receive of his estate seems to have come up for discussion during the conference between the father and daughter and by reason of her remarks that she supposed the next thing he would cut her out of his will. He then assured her he would not do so. In answer to questions to Judge Peticolas as to the conferences had in his office between Mrs. Carstairs and J. H. Nail, witness said, in substance: We had up four subjects—the original $5,000, in connection with the house, the claim of Mrs. Carstairs against her father for not having truly accounted to her for her interest in her mother's estate, the question of whether he would purchase certain lands which he had agreed to purchase from her, and the question of whether she should remain a beneficiary in his will. She claimed he had settled with her on the basis that the property was community property when it was really her mother's separate property; that the valuation placed on the inventory on the assumption that the property was community was much less than the value of the property; that she did not get certain property he had conveyed to her in satisfaction of her community interest.

The evidence is undisputed that some time before J. H. Nail arrived in El Paso, and before the conferences resulting in the statement, Mrs. Carstairs, through her attorneys, had commenced an investigation of the matters of difference between them, and that because of such investigation Nail came to El Paso and entered into the conferences which resulted in the settlement as evidenced by the letter of June 9, 1921.

This brings us to the consideration of the questions of law involved in the controversy.

 Is the contract expressed in the letter of June 9, 1921, based upon an adequate consideration? Defendants submit that it was not.

The former article of the statute, article 7093, providing that every contract in writing shall import a valuable consideration, was omitted from the Revised Statutes of 1925. The article was a part of the statute when the contract was made. What "imports a consideration" meant that the writing carries a prima facie case of consideration which might be attacked by the obligor and want of consideration shown under a sworn plea. We think it might be held that the omission of the article from the statute might shift the burden of proof of want of consideration and leave the issue as on a parol contract where the party claiming under a parol contract must prove a consideration precedent to recovery. However, we do not consider it important here, as the contract expresses a valuable consideration, and no consideration other than that expressed is suggested.

It is contended that the $5,000 remitted is a bounty and for that reason is not a valuable consideration. Nail had promised to give Mrs. Carstairs $15,000 with which to buy a home, and had given her, of that, $10,000, and at times before and during the conferences admitted the obligation and as a part of the settlement promise to pay it, and as a part of the matters settled he was released from its payment, and as a part of the contract said: "As you have released me from the $5,000.00, which some time ago I obligated myself to you for, and to allay all friction, I assure you that this will shall be carried out."

The promise, we think, was at least a moral obligation. It may be that in the absence of any consideration deemed valuable in the eyes of the law deprived it of legal obligation to perform it; however, there are conditions when the law will recognize a promise based on actual benefits received. In such cases the moral obligation to perform the former contract is deemed sufficient to make the old contract an adequate consideration for the new promise, which becomes the indebted-

ness. We are not prepared to admit that the original promise was a bounty. We have here only the promise. The evidence does not show whether the original promise was based on benefits received. But where the parties, as here, are dealing at arm's length, and the payment of the promised amount is brought into the dispute, and it figures. as a part of the consideration in the compromise of a doubtful claim and is accepted as an obligation, and a new promise to pay is made, we think it then becomes an adequate consideration; that is, the rule is stated to be that the compromise of a doubtful claim is an adequate consideration. Hunter, Evans & Co. v. Lanius et al., 82 Tex. 677, 686, 18 S. W. 201, 205, where the rule is stated as follows: "Where one executes an obligation in renewal of a note claimed by the holder to be valid, but known to the maker to be fraudulent or without consideration, the latter will be deemed to have freed the transaction of the fraud, and to have waived the want of consideration, and will not be permitted to plead it. So, a note is supported by a sufficient consideration, if executed to secure the abandonment of a suit brought to enforce a doubtful right, or in compromise of a disputed claim made in good faith, though it ultimately appears that the claim was without merit. Keefe v. Vogle, 36 Iowa, 87; Babcock v. Hawkins, 23 Vt. 561; 1 Daniel, Neg. Inst. § 205; 1 Aad. Cont. § 14."

The waiver was held to be a matter of law. Many references have been made to the Hunter-Lanius Case. Some of the cases, while admitting the rule as stated, express the idea that the waiver is one of fact rather than of law as to the existence of waiver. Other cases are to the same effect. Camoron v. Thurmond, 56 Tex. 22; Walker-Smith Company v. Pouns (Tex. Civ. App.) 256 S. W. 613; Scott v. Lott (Tex. Civ. App.) 247 S. W. 685.

In O'Fiel v. Janes (Tex. Civ. App.) 269 S. W. 1074, 1082, affirmed in (Com. App.) 280 S. W. 163, it is said: "In passing upon the effect of compromise settlements, no investigation into the character or value of respective claims will be made; it being sufficient that the parties thought there was a question between them. Little v. Allen, 56 Tex. 139. When a right is doubtful, or is controverted, or where the object is to avoid or settle litigation, a compromise duly executed will not be set aside by the courts if the parties acted in good faith, and there is no fraud or misrepresentation. Pegues v. Haden, 76 Tex. 99, 13 S. W. 171" (and other cases referred to) Texas Jurisprudence, vol. 9, page 335, §§ 3 and 6, where it is said: "The mutual agreement for the compromise is in itself a valuable consideration and sufficient to support the contract, the consideration being the release of the rights of the parties and the avoidance of the expenses and annoyances of a suit. It is said the real consideration which each party receives under the compromise is not the sacrifice of a right, but the settlement of a dispute and the abandonment of a claim."

The contract further provides: "And to allay all friction between us" Nail assures Mrs. Carstairs that the provisions in his will then handed to her in which she is bequeathed one-fourth part of his estate shall be carried out as far as she is concerned.

Plaintiff submits that the parties were entitled to show to what the friction related and that the matters causing the friction, and released and abandoned by Mrs. Carstairs, constituted a consideration for the contract. It seems to us that, under the undisputed testimony, all of the matters that entered into the dispute and controversy affecting the properties involved, regardless of the right or wrong of either party to the controversy, would necessarily be a part of the consideration, as much so, and for the reason, as was the $5,000. We must refer to the evidence without quoting it for the matters in dispute. The parties agreed and settled some matters in dispute and some apparently were remitted and abandoned. The term used, "and to allay all friction between us," is put in a separate clause in the contract to the release of the $5,000, and apparently included all matters in dispute.

In Jordan v. Abney, 97 Tex. 296, 78 S. W. 486, 489, without quoting the opinion at length, on a certified question our Supreme Court held: "That a contract between two persons, upon valuable consideration, that one will, at his death, leave property to the other, is enforceable, where no statute is contravened, is held by an almost unbroken current of authority, English and American. Such contracts, when sufficiently certain, have been held valid and enforceable, in equity as well as at law, whether they provide for the payment of money, or the leaving of specific property, or of all or a moiety of that which the obligor should leave at his death. They have usually been put in the form of agreements to bequeath by will, but this has not been regarded as an essential feature; agreements to leave the property, or that the obligee should have it at the death of the obligor, being held sufficient." The court refers to cases in addition to the cases cited in the certificate. We see no reason why the above Jordan-Abney Case should not apply to the instant case.

Defendants plead that the contract of June 9, 1921, was executed by Nail under duress. We think no duress is shown. We need only to refer to the correspondence already stated that followed immediately after the conferences and stated above.

The record shows that some time after the letter of June 9, 1921, was written the parties met at Albany, Tex., and at El Paso,

Tex., and again renewed some of the matters which were discussed in their several days conferences prior to June 9, 1921; upon that feature of the case much evidence was offered. We have carefully reviewed it. The evidence shows, conclusively we think, that the contract of June 9, 1921, was never rescinded, changed, or modified, and that the contract as made on June 9, 1921, remained unchanged as it then was at the time of Mrs. Carstairs' death in 1927.

We have concluded, on the whole case, that the contract of June 9, 1921, was based upon an adequate consideration; that the consideration being adequate, J. H. Nail having left a will devising his property to others in violation of his contract, the property became charged in their hands with a constructive trust in favor of plaintiff as the sole beneficiary in her will.

The case is reversed, and the case having been fully developed, judgment is here rendered in favor of plaintiff as prayed for in his petition.

Reversed and rendered.

### Supplemental Opinion.

In our main opinion we reversed and rendered this case for the appellant, thereby establishing the right of appellant to recover from the appellees the one-fourth interest in the estate of James H. Nail as of the time of his death, as prayed for in the petition.

The prayer of plaintiff's petition in the trial court is set out in the margin.[1]

It is apparent that to afford the appellant the relief prayed for by him, it will be necessary to reverse and remand the case to the trial court with instructions. The case is, therefore, reversed and remanded, with instructions to the trial court to ascertain the property in which appellant is entitled to a one-fourth interest as adjudicated by this court, and to render judgment in appellant's favor for said one-fourth interest and award all other relief necessary or appropriate to carry out the opinion of this court.

---

[1] "Wherefore, plaintiff prays that the defendants and each of them having been duly cited in accordance with law to appear and answer this petition, that upon a trial hereof that the defendants be required to discover, specify and show the personal properties owned by James H. Nail, either as his separate property, or as the community property of himself and wife, Mrs. Chloe A. Nail, at the time of the death of the said James H. Nail, and to discover, specify and show the separate value of the articles thereof and the description and location thereof; that the court find and determine what properties owned by James H. Nail and his wife, Mrs. Chloe A. Nail, at the time of the death of said James H. Nail, constituted the separate estate of James H. Nail and what part thereof constituted the community estate of the said James H. Nail and said Mrs. Chloe A. Nail; that the equitable title of the plaintiff to an undivided ¼ interest in and to all the properties, both real and personal, owned by said James H. Nail at the time of his death, be established as herein alleged and that the defendants herein be declared and decreed to hold the legal title to plaintiff's said interest in said properties in trust for the plaintiff and that such legal title to such interests be divested out of the defendants and vested in the plaintiff by the decree of this court; that the court find and determine the shares or interest owned by the various parties hereto in and to all of the properties herein described and find and determine whether said properties, both real and personal, or any part thereof, are susceptible of partition in kind; that the court partition all of said properties, both real and personal, as provided by law and that the title be vested in each of the parties hereto in and to the properties partitioned and set aside by the decree of the court as to each respective party; and that possession of the properties to which each party is entitled be delivered and placed in such person as provided by law; and that any properties, either real or personal, that may be found by the court not to be susceptible or partitioned in kind be sold under the direction and orders of the court as provided by law and the proceeds from such sales partitioned and delivered to the parties hereto according to their respective interests; and plaintiff further prays for such other and further relief, both general and special, legal and equitable, as he may show himself entitled to under the facts."