# MARCH, 1935

W. P. BOMAR, EXECUTOR, ET AL. V. ROBERT CARSTAIRS.

No. 6280.   Decided March 6, 1935.
(79 S. W., 2d Series, 841.)

*Lea, McGrady, Thomason & Edwards,* of El Paso, *J. M. Caldwell,* of Midland, *Cantey, Hanger & McMahon, Gillis A. Johnson* and *C. W. Trueheart,* all of Fort Worth, for plaintiffs in error.

The promise of James H. Nail was personal to his daughter and implied the condition that she should be alive when he died. And in case she should die before her father, her husband would

take nothing. McLamore v. Heffner, 33 Texas, 514; Prater v. Prater, 77 S. E., 936; Alexander v. Lewis, 175 Pac., 572; 9 Cyc., 631; 13 C. J., 643.

A promise of a father to his daughter that he would not disinherit her, unsupported by any consideration, lapsed with the death of the daughter, the father still being alive. Wyche v. Clapp, 43 Texas, 549; Hammett v. Farrar, 8 S. W. (2d) 236; Ballard v. Camplim, 67 N. E., 505; Ward v. Bush, 45 Atl., 534.

*E. M. Whitaker, Whitaker & Peticolas*, of El Paso, *R. W. Hamilton*, of Midland, *Goree, Odell & Allen, Geo. W. Rice, Allen & Gambrill*, all of Ft. Worth, *Black & Graves*, and *Charles L. Black*, of Austin, for defendants in error.

The effect of the contract was to immediately vest in Mrs. Carstairs a remainder to one-fourth of any property that her father might own at the time of his death with a life estate in the father. Caples v. Ward, 107 Texas, 341; Arnold v. Southern Pipe Line Company, 123 S. W., 1162; .id., 139 S. W., 917; Clarke v. Clarke, 121 Texas, 165, 46 S. W. (2d) 658; Page on Wills (2d Ed.), page 192.

MR. PRESIDING JUDGE RYAN delivered the opinion of the Commission of Appeals, Section B.

This suit was brought by Robert Carstairs, defendant in error (plaintiff in the trial court and appellant in the Court of Civil Appeals), as sole devisee and legatee of his deceased wife, Elizabeth Carstairs, a daughter of J. H. Nail, deceased, to establish a constructive trust and to recover a one-fourth interest in the estate of the said J. H. Nail, against W. P. Bomar and others, plaintiffs in error (defendants in the trial court and appellees in the Court of Civil Appeals) being the executors, devisees and legatees of and under the last will and testament of said J. H. Nail, deceased. It is founded upon a letter dated June 9, 1921, written by the attorney of said Elizabeth Carstairs and signed by Nail.

The trial court peremptorily instructed a verdict for the defendants and rendered judgment accordingly, which was reversed by the Court of Civil Appeals with definite instructions, on remand, to ascertain the property in which appellant is entitled to a one-fourth interest, as adjudicated by the Court of Civil Appeals, and to render judgment therefor. 48 S. W. (2d) 786.

The record is extremely lengthy; in the interest of as much

brevity as is possible we summarize the important facts, as follows:

The first wife of J. H. Nail was Addie Terry Nail, to whom he was married on April 11, 1878; she died intestate on June 20, 1892, survived by two children, Celia and Elizabeth.

Celia married Morris J. Stimson and died in September, 1920, leaving surviving, her husband and two children, Morris J. Stimson, Jr., and Elizabeth Stimson, who married John A. Burley.

Elizabeth Nail married the plaintiff below, Robert Carstairs, on December 29, 1917; she died childless on May 3, 1927, the surviving husband being her sole legatee and devisee under her will.

After the death of his first wife, J. H. Nail, on or about September 13, 1893, married Chloe Black; two children were born of the second marriage, James H. Nail, Jr., and Jewell Ruth Nail, who married W. P. Bomar.

After his first wife's death, Nail, about January 20, 1893, filed in the County Court of Hunt County, Texas, his application to administer, as survivor, their community estate and was appointed such community survivor and filed an inventory, oath and bond. In January, 1905, Nail made a settlement with his two daughters, Celia and Elizabeth, as to the property they inherited from their deceased mother, and obtained full release from them.

Some time prior to June 9, 1921, Nail decided that he wanted to give each of his children $15,000.00 with which to buy a home and had actually given Elizabeth $10,000.00 and promised that when she bought the place or started to build it, he would give her the remaining $5,000.00, but not wanting a home in El Paso, Elizabeth asked her father to let her keep the $10,000.00 in lieu of getting $15,000.00 and having to buy a home. This is the $5,000.00 referred to in the letter instrument dated June 9, 1921, hereinafter referred to.

Elizabeth owned seven sections of land in Martin County, which her father agreed in writing dated April 2, 1921, to purchase at $12.50 per acre, payable $10,000 in government bonds and the balance in vendor's lien notes divided into four equal payments. Some question as to the details concerning a balance of purchase money due the State and amounts paid for her by him in taxes and interest, was raised by Nail in correspondence with the attorney (Judge J. G. McGrady) preparing the papers; then on April 30, 1921, Nail advised the attorney,

"I do not think it best for me to buy this land from Elizabeth for several reasons," which he then stated.

In the meantime Nail wrote his daughter suggesting that she let the purchase go over until fall, to which she replied on May 16, 1921, that she was unwilling to do so and had employed another lawyer, Judge E. M. Whitaker, "and he will talk to Judge McGrady"; she wrote "as you know, you agreed to buy my land and directed me to have Judge McGrady draw up the deed, which I have requested him to do. However, I think it would be best for you to also tell him to do so in order that the matter may be disposed of at once. Mr. Carstairs approves of this." On May 26, 1921, Nail wrote her "I want you to stop the talk, if you can, about you going to sue me. The news of this trouble between you and I is spreading all over the country from El Paso to Dallas. It comes to me by rank strangers from El Paso and must have come from you or your lawyers. * * * I wrote Mr. McGrady to get you and your lawyers together and figure up the deal according to the statement I sent him and make out deed and send to the Fort Worth National Bank and that I would sign notes and send the bonds to you. I want you to do this and let's stop this matter. It is an honest statement backed up by the deed and is just how the matter stands between us, so you close it up and let me have some peace. I will deed your land back to you at any time within five years from your deed to me, provided you will hold it another five years in your own name, at eleven dollars per acre, and you can keep this letter in evidence and show it to your counsel and ask him if it is not a fair proposition."

Those letters were followed by one from the law firm of Whitaker & Peticolas, dated El Paso, May 30, 1921, addressed to J. H. Nail, Fort Worth, as follows:

"Mrs. Elizabeth Carstairs has shown us your letter to her of May 26th, with reference to the sale of her Martin County lands to you, and Judge McGrady has shown us your letters of April 30th, and a letter which, taken in connection with your letter to Mrs. Carstairs, makes clear what your proposition is with reference to closing this deal.

"We are instructed to say that the same is unacceptible. We are further instructed to say that Mrs. Carstairs will deed you the land at any time between now and June 5th in exact accordance with your written contract to purchase the land; that is to say, you are to pay for the land $12.50 an acre, $10,000.00 in Liberty Bonds at par, the balance in 1, 2 and 3 years at 7%.

"Mrs. Carstairs will pay the taxes for 1921 and assume the State debt against her sections which amounts to substantially $1402.00.

"She asks us to call your attention to the fact that in making this offer she is foregoing the lease money for April and May.

"We are definitely instructed further to advise you that unless by June 5th, 1921, you complete the trade along the lines indicated, legal proceedings will be instituted to force your compliance with your contract."

Early in June, 1921, Nail went to El Paso where a series of conferences extending over several days was held by him with Elizabeth Carstairs, her husband, and Judge W. M. Peticolas, their attorney, in the latter's office. Nail was not represented by attorney. Judge Peticolas testified "To give you an accurate idea of what occurred: Mr. Nail and Mrs. Carstairs were very much wrought up at these conferences. The conferences were very distressing and embarrassing to me because the parties indulged in mutual renunciations, accusations, profanity, weeping—a regular cat and dog fight each time they met. It is impossible to say which did most of the talking. Her attitude toward her father was abusive at times, he cried a great deal but he nearly always said something."

Judge Peticolas testified that the substance of the conferences was "that Nail agreed to buy the land, that she would relieve him of the $5,000.00, that he would give her the document about leaving her in his will and that it should settle the community estate matter; the first question discussed was whether Nail would carry out his agreement to purchase the land and finally he agreed to do so." Then she said to him "I reckon the next thing you will do is to cut me out of your will or words to that effect. Mr. Nail said he would not do this" when Judge Peticolas suggested that be put in writing, and immediately wrote the following instrument which Nail signed, viz:

"El Paso, Texas, June 9, 1921.

"Mrs. Elizabeth Carstairs,
El Paso, Texas.
Dear Daughter:

"I am handing you herewith a copy of my will which has been re-drawn and which is to be executed by me as soon as I reach Fort Worth.

"In this will you are left one-fourth (1/4) part of my estate after a special legacy to my son, James H. Nail, Jr.

"As you have released me of the payment of the five thousand ($5,000.00) dollars, which some time ago I obligated myself to you for, and to allay all friction between us, I assure you this will shall be carried out as far as you and Celia's children are concerned, and at my death you will receive one-fourth (1/4) part of my estate.

Your father,

J. H. Nail."

After said conference and signing by Nail of the instrument of June 9, 1921, the transfer from Mrs. Carstairs to Nail of the lands in Martin County was consummated as agreed to at said conference. Receipt of the Liberty Bonds and vendor's lien notes was acknowledged in letter dated June 14, 1921, to the Fort Worth National Bank (copy mailed to Nail) by Mrs. Carstairs, her husband, and Messrs. Whitaker & Peticolas, her attorneys; the vendor's lien was properly released on August 14, 1923, by Mrs. Carstairs and her husband.

On June 15, 1921, in letter written from El Paso by Mrs. Carstairs to her father, she said "the more I think of the settlement we made when you were here, and the letter you wrote me assuring me that you would not disinherit me and that I would get my one-fourth part of the estate, the more pleased I am with it and I want to say that I accept it very gratefully."

Before he had received that letter, he, under date of June 16, 1921, wrote Mrs. Carstairs that he had signed the will and was sending it to the Fort Worth National Bank. He wrote "Don't you ever get it into your head that I will ever disinherit any child I have got, no matter what they do or what influence is brought to bear against me."

Then on June 21, 1921, from Albany, Texas, Nail again wrote her as follows:

"Dear Beth:

"Your letter telling me that you was happier now over my letter to you about your inheritance was received four or five days ago and it did me lots of good and made me feel happy for I never had any thought of making any difference in any child I have, so believe all I tell you and as far as I can I shall never see or know any preference in any of you, although born or different women. You are all the same to me, so be happy ever after, as to me you are my child and I love you and no power on earth could ever induce me to give you the worst of it."

Notwithstanding these professions of amity and good will,

Mrs. Carstairs several months afterwards claimed that her father had not accounted to her for her full share of her deceased mother's estate in the settlement thereof had in 1905; some reference was made by her to the leaving of the matter for settlement, to Mr. W. I. Cook, who had married her aunt— the sister of her father. In September, 1921, she wrote her uncle (Mr. Cook) that she had made a mistake in figuring the sums due.

In the meantime Nail had gone north and returned to Albany, Texas, on September 19, 1921, when he was told that Mrs. Carstairs had been there claiming that he (Nail) had not properly settled with her on account of her mother's estate; he expressed surprise and the next day again wrote her, protesting that he had settled fairly and that she and her sister Celia had not only received their part, but much more, of their mother's estate, also that he would defend any suit she might bring. All her efforts to reopen that matter were unsuccessful.

J. H. Nail, in 1919, had executed a will reciting "all the remainder of my estate, both real and personal, I give, devise and bequeath to my four children equally, share and share alike, to-wit: Celia Stimson, Elizabeth Carstairs, both now of El Paso, Texas, Jewel Ruth Bomar of Fort Worth and James H. Nail, Jr." with the provision that the devise to James H. Nail, Jr., shall be made up wholly out of the testator's community half of his lands in Shackelford County. This will also provided that should his daughter Celia Stimson predecease him, her share should pass in trust to Elizabeth Carstairs for the benefit of Mrs. Stimson's two children, applying the net income thereof and part of the principal, if necessary, for their education and maintenance until they respectively attain the age of twenty-five years, when the principal thereof shall be delivered to them respectively. Likewise the devise to testator's son James H. Nail, Jr., was not to be delivered to him until his twenty-fifth year of age, the testator's wife, in the meantime, to hold it in trust, applying the income to the son's education and maintenance until his twenty-first year of age, and afterwards during the trusteeship, to deliver said income to said son.

No restrictions or limitations were placed upon the devise to Elizabeth Carstairs or upon the devise to Jewel Ruth Bomar, and no direction given as to the disposition thereof should they or either of them predecease the testator.

The will of 1919 was superseded by the will of June, 1921, (the one referred to in the instrument of June 9, 1921) in which, after appointing executors, statement with reference to

his separate and community estate, and a special devise to his son, James H. Nail, Jr., it is recited:

"Item Five:—All the remainder of my estate, after the special legacy above in Item Four, given to my son, I give, devise and bequeath as follows:—

"To Elizabeth Carstairs, of El Paso, Texas, my daughter, one-fourth (¼) part of my estate.

"To Jewel Ruth Bomar, of Fort Worth, Texas, my daughter, one-fourth (¼) part of my estate.

"To my son James H. Nail, Jr., one-fourth (¼) part of my estate remaining after the special legacy to him named in Item Four." (It is then directed that such one-fourth shall be made up wholly out of the lands in Shackelford County, Texas, to be taken in one solid block at its fair valuation.)

"One-fourth part of my estate, after the special legacy to my son named in Item Four, I give, devise and bequeath to my daughter, Elizabeth Carstairs, in trust, however, for the benefit of Morris J. Stimson, Jr., and Elizabeth Stimson, children of my deceased daughter, Celia Stimson." (Then follow certain directions with reference to the income from and final disposition of said devise to the Stimson children, and the creation of a trusteeship in testator's wife, concerning the devise to the son, James H. Nail, Jr., during his minority and until his twenty-fifth year of age, similar to like provisions in the will of 1919, and therefore unnecessary to repeat.)

Testator appointed his wife, Chloe A. Nail and his friend, Joe A. Mathews, as joint independent executors, without bond—his friend Joe M. Reynolds to substitute for Mathews in event of the latter's declination or inability to act.

Said will of 1921 remained in force until after the death of Elizabeth Carstairs in 1927, when under date of May 11, 1927, Nail executed the will which has been admitted to probate (revoking all wills theretofore made); it provides that after payment of all lawful claims against his estate including cost of a suitable but modest monument over his grave, and appointment of his wife Chloe A. Nail and W. P. Bomar, joint independent executors, and after certain recitals with reference to his separate estate, and the bequest to the wife of their homestead, household and kitchen furniture and automobiles, the remainder is disposed of, thus:

"Fifth.—(a) To my son James H. Nail, Jr., of Fort Worth, Texas, a one-third (1/3) part of my estate." (Then follows the provision that same shall be made up wholly out of the lands in Shackelford County, Texas.)

"(b) To my daughter, Jewel Ruth Bomar, of Fort Worth, Tarrant County, Texas, a one-third (1/3) part of my estate.

"(c) A one-third (1/3) part of my estate I give, devise and bequeath to Mrs. Chloe A. Nail, of Fort Worth, Texas, in trust, however, for the benefit of Morris J. Stimson, Jr., and Elizabeth Stimson, children of my deceased daughter Celia Stimson."

Then follow directions with reference to the control and management of said trust estate until the beneficiaries thereof shall respectively attain the age of twenty-five years. Provision was made that should said trustee not survive, Jewel Ruth Bomar substitute as trustee until said beneficiaries attain the age of twenty-five years respectively.

J. H. Nail died on or about August 2, 1928, and said will was probated on September 6, 1928, and appraisers appointed; the inventory of the estate places the total value of separate and one-half of the community estate at $824,296.35.

### OPINION.

Defendant in error contends that the instrument of June 9, 1921, was a present irrevocable vesting of one-fourth of her father's estate as it existed at his death, into defendant in error's wife, Elizabeth, which passed to him upon her death.

Plaintiffs in error contend that said instrument was personal to his daughter, the said Elizabeth, and was carried out by the making of a will in accordance therewith, but any devise thereunder to Elizabeth lapsed at her death before that of her father, the devisor under the will and promissor under the contract.

Our statute (Art. 8295, Rev. Stat., 1925; Art. 7869, Rev. Stat., 1911; Art. 5347, Rev. Stat., 1895) provides:

■ Art. 8295. Where a testator shall devise or bequeath an estate or interest of any kind by will to a child or other descendant of such testator, should such devisee or legatee, during the lifetime of the testator, die leaving children or descendants who shall survive such testator, such devise or legacy shall not lapse by reason of such death; but the estate so devised or bequeathed shall vest in the children or descendants of such legatee or devisee in the same manner as if he had survived the testator and died intestate.

At common law, upon the death of a devisee (under a will not providing for remainder over) preceding that of the testator, the devise lapsed. Leatherwood v. Stephens (Com. App.), 24 S. W. (2d) 819; Coleman v. Jackson, 126 S. W.,

1178; Lightfoot v. Poindexter, 199 S. W., 1152; 40 Cyc., 1925; Jarmon on Wills (6th Ed.), Sec. 609. That rule is still the law in this state. Ellet v. McCord, 41 S. W. (2d) 110. It was doubtless to take children and descendants of predeceased devisees out of the common law rule that Art. 8295 was enacted.

In Watkins v. Blount, 43 Texas Civ. App., 460, 94 S. W., 1116, it was claimed that the common law rule insofar as it may be applied in this case is abrogated by said statute, but Chief Justice Gill of the Galveston Court of Civil Appeals, held—correctly, we think—that the statute applies alone to lineal descendants of the testator and has no application to devisees whose relationship is collateral.

The Court of Civil Appeals herein was of the erroneous opinion that Art. 8295, Rev. Stat., 1925, has no application because it does not provide that a devise shall lapse if the devisee during the life of the testator dies without leaving children, and while the article states the circumstances under which the devise will not lapse, it makes no statement of circumstances under which the devise will lapse.

This precise question was passed on by the Commission of Appeals in Leatherwood v. Stephens, 24 S. W. (2d) 819, and Judge Critz said "By the rule of implied exclusion, the statute having confined its application to cases where the devise is made to a child or other descendants of the testatrix, it will be presumed that the legislature intended to exclude devisees not coming within its terms."

It follows, that Elizabeth Carstairs having died prior to the death of the testator leaving no child or other descendant, the bequest to her, lapsed.

It is contended by defendant in error that the rights of Mrs. Carstairs were fixed as a matter of contract by the instrument of June 9, 1921, and she could thereafter dispose of such rights, but this must be answered by the question, what rights did she have under the contract? An analysis of said instrument discloses, first that she would be left, by will, one-fourth of the estate after a special legacy to the son James H. Nail, Jr., and secondly that the will shall be carried out as far as she and her deceased sister Celia's children are concerned, and at his death she is protected by will to the extent of one-fourth of the estate. The obligation was to protect her by will to that extent; no present interest in the estate was conveyed —only the promise that she would not be disinherited.

The Court of Civil Appeals say that the legal effect of the

contract of June 9, 1921, "was fairly well before the Supreme Court" on certified question in Carstairs v. Bomar, 119 Texas, 364, 29 S. W. (2d) 334. An examination of Judge Harvey's opinion discloses that the question certified was one of venue only—"was the venue properly laid in Martin County?"

The certificate upon which the court acted shows that the original petition, copied in the opinion, and not now before the court since it was amended, did not set out the letter of June 9, 1921, but alleged only that on that date a dispute was in progress between Elizabeth and her father growing out of her claim that he had not fairly settled with her for her share of the deceased mother's estate and she was proposing to institute suit for recovery thereof, whereupon in consideration of the settlement of that dispute and her forbearance to prosecute such suit and in full settlement of all properties that she might be entitled to as so asserted by her, and in consideration of Elizabeth releasing him from the payment of an obligation for $5,000.00 therefore made by him to her, he would prepare and execute his last will and testament by which she would receive a one-fourth of his estate upon his death or such one-fourth less the properties bequeathed to James H. Nail, Jr.

As stated above the only question certified was one of "venue" in Martin County and the court concluded, that, as instituted, the suit was for the recovery of land within the meaning of the statute, and venue was properly in Martin County.

Furthermore, the certificate, as quoted in the report states, as a basis for the opinion there rendered, that Nail did not carry out his promise, whereas the present amended petition and the evidence show that Nail did carry out his promise and that his will thereunder remained in force unchanged, until after her death without child or other descendant, when he made the will that was later probated under which his three other children shared alike.

The bequest was personal to Elizabeth—a transaction between father and daughter, to which the husband Carstairs was not a party and to which he is not shown to have assented or in which he agreed to do or forbear doing anything. The father carried out his promise "not to disinherit" Elizabeth and had she survived him, she would have inherited the one-fourth of his estate just as she would have inherited had the father died intestate.

There is nothing in the instrument indicating any intention upon the father's part or any understanding between them that the devise in case he survived her, should go to her husband

or any other stranger in blood. There is no devise over, but the promise, personal to Elizabeth, is that "the will shall be carried out so far as you and Celia's children are concerned, and at my death you (meaning Elizabeth—not her husband or any one else) will receive one-fourth part of my estate." If the will had not been changed, the husband would have profited nothing, because the wife's prior death terminated the contract and the bequest lapsed. Coleman v. Jackson, 126 S. W., 1178. The will was referred to and became part of the contract.

On the other hand, if Elizabeth had left a descendant who survived the testator, the descendant would, under the statute, have taken the part bequeathed to Elizabeth and any pretended testamentary disposition thereof by her foreclosing the descendant's such right, would have been futile.

Defendant in error insists that Mrs. Carstairs acquired a vested right under the contract, not dependent upon the will or the testamentary intention of the testator. It is elementary that the intention of the parties must be sought (Haupt v. Michaelis, 231 S. W., 706; Gilliam v. Mahon (Com. App.), 231 S. W., 712; McNeill v. St. Aubin, 209 S. W., 781; 68 C. J., 574-5; 40 Cyc., 1066); the instrument under consideration may be part deed, part power of attorney and part a last will. Powers v. Scharling, 64 Kan., 339, 67 Pac., 820; Robinson v. Schly, 6 Ga., 515; Stewart v. Stewart, 177 Mass., 493, 59 N. E., 116; Jones v. Jones, 163 Tenn., 237, 43 S. W. (2d) 205; Lakin v. Blum, (Mo. App.), 43 S. W. (2d) 853. It is manifest to us that the intention of the parties was only that Elizabeth should not be disinherited, was so understood by Elizabeth when she afterwards wrote her father telling him how happy she was not to be disinherited and by him when he replied that he would not disinherit any child and had never thought of making any difference in any such child. She was not disinherited, as is shown above and only her prior death voided the bequest.

The judgment of the Court of Civil Appeals is reversed and that of the District Court is affirmed.

Opinion adopted by the Supreme Court March 6, 1935.