*In re* TRAUB ESTATE.

BATES *v.* NATIONAL BANK OF DETROIT.

1. INDEMNITY—CONSTRUCTION OF CONTRACT.
    An indemnity contract is to be strictly construed against him who claims to be an indemnitee.

2. ESTATES—WORDS AND PHRASES—HEIRS—WORDS OF LIMITATION.
    The words to the grantee *and his heirs* are normally construed as words of limitation and not of purchase, since they merely delimit the estate given and do not designate those who take by remainder.

---

REFERENCES FOR POINTS IN HEADNOTES

[2]  57 Am Jur, Wills § 1368.
[3, 8]  12 Am Jur, Contracts § 375.
[4]  21 Am Jur, Executors and Administrators § 337.
[5, 10]  57 Am Jur, Wills §§ 1425, 1427.
[6]  12 Am Jur, Contracts § 235.
[7]  20 Am Jur, Evidence § 585.
[9]  57 Am Jur, Wills § 1464.
[11]  21 Am Jur, Executors and Administrators §§ 348, 408.
[11]  Necessity of presenting claim against decedent's estate for specific performance of contract to make a will in favor of another or to will the latter a specified sum or property.  113 ALR 1070.
[12]  21 Am Jur, Executors and Administrators § 368.

3. CONTRACTS—CONSTRUCTION—PRESUMPTIONS—WILLS.

It will not be presumed that written agreement whereby deceased brother-in-law had given up his interest in estate of his childless brother to latter's widow in return for her promise to leave stock in the brothers' family corporation to him upon widow's death was to have been a promise on her part that was personal to the brother-in-law and would die with him.

4. SAME—PRESUMPTIONS—CONSTRUCTION—CONSIDERATION.

It is a presumption of law, in the absence of express words, that the parties to a contract intend to bind not only themselves, but their personal representatives, a presumption extending not only to the obligation of the contractual performance but to the corresponding right to receive the consideration therefor, where not personal in nature.

5. WILLS—DEATH OF LEGATEE—LAPSE OF LEGACY.

A legacy which is given upon a valuable consideration, as in payment of a debt of testator, does not lapse at common law upon the death of the legatee prior to the death of the testator.

6. CONTRACTS—AMBIGUITY—PAROL EVIDENCE.

A court will admit testimony as to antecedent agreements, communications and other factors to aid in construing an ambiguous written agreement, the parol evidence rule to the contrary notwithstanding.

7. EVIDENCE—HEARSAY—MENTAL STATE OF ACTOR.

It is not objectionable to the hearsay rule that the mental state of the actor be established by either word or deed, where his belief, understanding, or intent is material, words being received, not for their own testimonial trustworthiness, but as proof of a state of mind.

8. CONTRACTS—RIGHT TO POSSESSION—DEATH OF PROMISEE.

A promisee's contract right to possession of personalty upon a fixed date does not die with him where he dies before such date, upon the theory that after death he cannot "possess" anything, especially where the promisee has furnished a substantial consideration to the promisor.

9. SAME—WILLS—ENFORCEMENT—CONSIDERATION.

The fact that a form of obligation of childless widow who received life use of all of her late husband's stock in family corporation was her promise to make a will in which she would leave promisee brother-in-law all of the stock at her death would not make it less enforceable as a contract obliga-

tion, since the, true consideration was the thing promised, not
the form of the promise or the fact that merely a promise was
made.

10. WILLS — DEATH OF LEGATEE PRIOR TO TESTATOR — LAPSE OF
LEGACY.
    A debt, represented by a legacy or bequest, but for value received,
    used, and kept remains collectible despite its form, so long as
    unpaid and is to be distinguished from a legacy or bequest
    in the gratuitous sense, as the former does not lapse upon the
    death of the legatee prior to the death of the testator.

11. ESTATES OF DECEDENTS—CLAIM AGAINST ESTATE—INTEREST—
COSTS.
    Judgment on claim against estate of deceased childless widow,
    with interest and costs, as by statute made and provided, is
    ordered entered, where, in return for life use of brother-in-law's
    interest in estate of her late husband, she had agreed to leave
    him her stock in family corporation, but had failed to keep her
    promise after death of brother-in-law (CL 1948, §§ 708.4,
    708.18).

12. SAME—TARDY CLAIM—REFEREE'S FEE.
    It was within the discretion of the probate court to impose the
    burden of the referee's fee upon claimant against the estate
    of the decedent, where claim against the estate was tardy.

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from Wayne; Maher (Thomas F.), J. Sub-
mitted April 16, 1958. (Docket No.·93, Calendar No.
47,550.) Decided October 13, 1958. Rehearing
denied January 12, 1959. ·

Barbara Traub Bates filed her claim against the
estate of Mary Clark Traub, deceased, for breach of
contract to make specific provision in will. National
Bank of Detroit and Peter J. Monaghan, co-executors
of will, Dorothy May Roehm, a beneficiary, and
Margaret Davis Greig, guardian of Margaret Caron
Kraatz, minor, a beneficiary, joined in objection and
defense. Claim disallowed in probate and circuit
courts. Plaintiff appeals. Reversed and remanded
· for entry of judgment for plaintiff.

*Moll, Desenberg, Purdy & Glover,* for plaintiff.

*Snider, Feikens, Dice & Thompson,* for defendants Roehm and Greig.

*Monaghan, Monaghan & Crawmer (James H. Lo-* ·
*Prete,* of counsel on application for rehearing), for coexecutor defendants.

Dethmers, C. J. (*dissenting*). William H. Traub, husband of the decedent, Mary Clark Traub, was the brother of Robert C. J. Traub, and the latter was the father of plaintiff, Barbara Traub Bates. The brothers owned equally all the stock, except 2 shares held by their respective wives, in the Traub Realty Company. They also had major stockholdings in Traub Brothers & Company, engaged in the jewelry business. In addition, they owned parcels of real estate as tenants in common.

In 1931 William died, intestate and without issue, leaving his wife and brother as sole heirs. It is stipulated that Robert's interest in William's estate was worth $86,000. Differences arose between Robert and William's widow, Mary, over the handling of real estate and conducting of the jewelry business, she contending that more dividends should be paid. An eminent lawyer, who for many years had been attorney for the Traubs, succeeded, in 1933, in working out a compromise agreement between them. He drafted an extensive instrument setting forth its provisions with evident skill and care and in detail. It was executed by Robert and his wife and by Mary, individually and as administratrix of the estate of William, on August 28, 1933. Under its terms the realty company was dissolved and its assets, real and personal, were divided between Robert and Mary on a specified basis, as were also certain pieces of real estate which had been owned by the brothers as tenants in common, Mary, as heir of William, agree-

ing, with respect to one of the latter parcels allotted to Robert, to convey the same to him and to protect and indemnify him "his heirs, personal representatives and assigns, from any and all claims that may at any time be asserted against said property by the creditors of the William H. Traub Estate." Under the contract Robert and Mary agreed that each should pay 1/2 of certain joint obligations of Robert and William allowed as claims against the latter's estate; and, finally, the agreement contained the provision here in controversy, reading as follows:

"Fourth: In consideration of the foregoing Robert C. J. Traub agrees that upon the closing of the estate of William H. Traub, deceased, or prior thereto in the event that Mary Clark Traub as administratrix of the estate of William H. Traub, deceased, obtains permission to convey to him the property described as part 1, in paragraph second of this agreement, that he will assign and convey to Mary Clark Traub individually all of his interest in the estate of William H. Traub, deceased, excepting the parcel last described. Elisabeth Taylor Traub agrees to join in such assignments and conveyances. In consideration of the foregoing transfers and of the matters contained in this agreement Mary Clark Traub agrees to forthwith make a will bequeathing to Robert C. J. Traub all of the shares of stock in Traub Brothers & Company now held by her individually and as heir-at-law of William H. Traub, deceased, and as assignee of Robert C. J. Traub, and further agrees in no manner to revoke such bequest, to the end that upon her death Robert C. J. Traub shall become possessed of said shares of stock free from any and all liens and encumbrances."

In 1934 the jewelry company was in financial difficulties and Robert put $50,000 into it, taking a preferred stock issue therefor. This saved the company, which gradually revived in the 1930's. Robert continued as its president and chief executive officer

until his death in 1950. In 1951 the company lost money. In 1952 the stockholders sold their stock, including all the Traub interests, at $11 per share. From that sale Mary realized $58,179. She died in 1954, leaving a will which contained no bequest to Robert or his estate or daughter, the plaintiff herein. Plaintiff filed a tardy claim against Mary's estate for damages for breach of her contract agreement to bequeath the stock to Robert, the claim being for the amount Mary had received for it.

The referee appointed by the probate court filed a report recommending disallowance of the claim. The probate court confirmed the report, disallowed the claim, and, because of the tardiness of its filing, ordered plaintiff to reimburse the executor of Mary's estate in the amount of $900, paid to the referee for his fees. The circuit court affirmed on appeal there, from which plaintiff appeals here.

The first question plaintiff raises is whether Mary's agreement to bequeath her stock in Traub Brothers & Company to Robert created a right personal to him so that it did not pass to plaintiff as his sole residuary legatee. Defendants rephrase the question as being whether the agreement committed Mary to name a substituted beneficiary in the event Robert predeceased her. We hold that the answer must be found in the intent of the contracting parties which is controlling.

Plaintiff says: that the right created in Robert by contract to have the stock bequeathed to him is one which will descend to his heirs or personal representatives, citing: *Trower* v. *Young,* 40 Cal App2d 539 (105 P2d 160); *Powell* v. *McBlain,* 222 Iowa 799 (269 NW 883); *Kisor* v. *Litzenberg,* 203 Iowa 1183 (212 NW 343); *Moore's Administrator* v. *Wager's Administrator,* 243 Ky 351 (48 SW2d 15); *Fuchs* v. *Fuchs,* 48 Mo App 18; *Torgerson* v. *Hauge,* 34 ND 646 (159 NW 6, 3 ALR 164); that the right will pass

under his will, citing: *Chase* v. *Stevens,* 34 Cal App 98 (166 P 1035); *Ochs* v. *Ochs,* 122 NJ Eq 143 (192 A 502); *Doyle* v. *Fischer,* 183 Wis 599 (198 NW 763, 33 ALR 733); that it is a right that may be assigned, citing: *Rosenberg* v. *Equitable Trust Co.,* 68 F Supp 991; *Swingley* v. *Daniels,* 123 Wash 409 (212 P 729); and that such bequest by Mary, had it been made pursuant to the contract, would not have elapsed, upon Robert's predeceasing her, like an ordinary legacy, citing such cases as *Bacon* v. *Kiteley,* 101 Colo 559 (75 P2d 590); and *Ward* v. *Bush,* 59 NJ Eq 144 (45 A 534). Examination of these cases cited by plaintiff discloses the following: In *Trower,* dismissed on motion, the complaint alleged that the promisor, who had agreed for a consideration to bequeath and devise 1/2 of her estate to promisees, had frequently confirmed and reiterated that her agreement was for the benefit not only of promisees, but also their heirs and distributees. This clearly established the intent of the contracting parties that the devises and bequests were not to lapse. The court's holding merely gave effect to the expressed intent of the parties. There is no comparable evidence in the instant case. In *Powell* the question of the lapse of a bequest was not directly discussed, evidently because of the applicability of Iowa's antilapse statute, to which reference was made in the opinion. In *Kisor* there were 2 beneficiaries of the promise to make a devise, of whom 1 predeceased and 1 survived the promisor. The court found from the testimony concerning the oral agreement evidence of an intent that the entire property was to be left to the 2 beneficiaries or to the survivor of them in the event 1 of them should predecease the promisor. In *Moore's Administrator* the promisor had agreed to make the third-party beneficiary of the contract "an equal heir with the rest of the children." An incident of such equality was the right of the issue of

the third-party beneficiary to take by right of representation, the same as in the case of the rest of promisor's children, in the event that said beneficiary should predecease the promisor. In *Fuchs* the question of lapse of a legacy was not discussed, but the Missouri antilapse statute applied. In *Torgerson* the question of lapse of a legacy was not directly discussed, but there, too, there was an applicable North Dakota antilapse statute. In *Chase* the agreement expressly provided that promisor would make a will leaving her property to the promisee "or his estate." In *Ochs* the court found evidence of an intent that promisor was to leave his property by will to the promisee or to those to whom the promisee might direct. What the court actually did was apply the New Jersey antilapse statute because it found no expression of a contrary intent by the promisor. In *Doyle* no question of lapse was involved because the legatee survived the promisor. In *Rosenberg* the agreement provided that the "bequest shall be binding should either or both (promisor or promisee-legatee) die without a will." The court found this language to be expressive of an intent that the agreement of the promisor should be operative even upon the death of the promisee-legatee. In *Swingley* the legatee survived the promisor-testator and, hence, no question of lapse was involved. In *Bacon* the testatrix made the bequest as provided by her agreement and permitted it to stand as her last will and testament until she died, 14 years after the legatee's death, evidencing an intent that the legacy was not to lapse. The agreement in that case to make the bequest was made in consideration of and to discharge an antecedent debt. The Colorado court in that case said (p 561):

"A general rule is that a legacy lapses by the death of the legatee, in testator's lifetime, if no successor

be named. * * * In case of a bequest to discharge a debt the rule changes because the reason changes. Here the thing in the testator's mind is the debt, not the person, and since had the debt been paid in legatee's lifetime it would have passed to his estate and gone to his heirs, and testator's intent been thus effectuated, the law so holds and the legacy does not lapse."

In *Ward* the problem presented to the court was the intent of the testatrix in making a bequest to one who thereafter predeceased her. Pursuing reasoning comparable to that of the Colorado court in *Bacon* the New Jersey court found an intent on the part of testatrix that the legacy was not to lapse because given to extinguish an antecedent debt. Upon analysis, it appears, then, that the above cases, relied upon by plaintiff, fall into 2 groups: (1) those in which bequests were saved by antilapse statutes, and (2) those in which the courts found evidence or expression of an intent on the part of the testator or of the parties to the contract to make a bequest that would not lapse. The antilapse statute group is of no aid to plaintiff here because the Michigan statute, CL 1948, § 702.11 (Stat Ann 1943 Rev § 27-.3178[81]), protects only the issue of predeceasing children and certain blood relatives of a testator and there was no such relationship between Robert and Mary. On the other hand, in the group of cases in which the courts found intent against lapse, such findings were based on contract provisions, testimony, or other proofs absent in the instant case. They are not of material assistance in arriving at the intent of Robert and Mary and thus determining the meaning of their contract.

In response to plaintiff's contention that rights of a promisee under a contract to leave property by will do not differ from those under other contracts and are, therefore, assignable and survive the death

of the promisee, defendants say that an understanding is necessary of the true nature and essence of such rights, and that controlling of the latter must be the intent of the contracting parties, disclosed, so they insist, in this case by clear and unambiguous terms of the contract. These show, defendants urge, that nothing more than a simple legacy was intended, subject to the rules of law applicable thereto. From this defendants reason, correctly we think, that the true nature of Robert's right to the bequest was such that it was contingent on his surviving testatrix, whereupon he would become possessed of a right which, so long as the bequest was not paid to him, would be assignable by him and would survive his death; but nothing more could pass from him to his heirs or assignees than he had in his lifetime, namely, full right to the bequest upon testatrix's death during his life, or nothing if he predeceased her. In this connection the Illinois court, in *Kaiser* v. *Cobbey,* 400 Ill 214 (79 NE2d 604), in considering rights created under an agreement to bequeath property by will and the question of lapse of the legacy made in pursuance thereof by reason of the death of the third-party beneficiary prior to that of the promisor-testatrix, said (p 223):

"These observations all go to the point that conditions were contained in the contract by the use of the word 'will,' the law of wills, and the ambulatory nature of wills. Since the agreement between the parties was to make wills and the law of wills would never have given William (third-party beneficiary) anything by the performance of the contract to make a will, it logically follows he never had any right to any of the property of Luella that he could pass on to heirs or assignees. A vested interest cannot be created by the contract unless its full performance would have put the title in William during his lifetime. The operation of the law of wills, which was

a part of the contract, under the facts in this case, prevents such a result."

So here defendants urge that it was the intent of Robert and Mary to give the ordinary meaning, common to the law of wills, to the words "agrees to forthwith make a will bequeathing to Robert," which were incorporated into the contract by a skilled attorney conversant with the legal significance of the terms. This, say defendants, is emphasized by the further language inserted by him in the contract to the effect that the bequest was to be made "to the end that upon her death Robert C. J. Traub shall become possessed of said shares of stock." Defendants point out that the attorney, in drafting the agreement, was not unmindful of the rights of Robert's heirs, as evidenced by its provision, hereinbefore noted, with respect to a parcel of land thereunder to be conveyed by Mary to Robert, that she agreed to protect and indemnify Robert and his heirs and assigns from any claims at any time asserted against the property by William's creditors. Defendants contend that testimony indicating a fondness on the part of William and Mary for plaintiff and a frequently expressed intention to make her the object of their bounty fails to establish that Mary intended to bind herself, by the contract, to make a bequest to Robert immune to lapse.

For the proposition that a bequest made pursuant to a contract supported by a valid consideration is subject to the general law of lapse the same as one made without consideration or contract, defendants cite 1 Jarman on Wills (8th ed), p 28; *Needham* v. *Smith*, 4 Russ 318 (38 Eng Rep 825); *Jones* v. *How*, 9 CB 1 (137 Eng Rep 790); *In re Brookman's Trust* (1869), LR 5 Ch App 182 (39 LJ Ch 138, 22 LT 891); *Jervis* v. *Wolferstan* (1874), LR 18 Eq 18 (43 LJ Ch 809, 30 LT 452); Theobald on Wills (9th ed), ch

10, p 61; *Andrews* v. *Lavery,* 159 Mich 26; *Keasey* v. *Engles,* 259 Mich 178; *Bassett* v. *Salter,* 25 NYS2d 176, affirmed in 262 App Div 967 (30 NYS2d 134); *O'Neil* v. *Ross,* 98 Cal App 306 (277 P 123); *Bomar* v. *Carstairs,* 124 Tex 492 (79 SW2d 841). The referee, probate and circuit courts concluded that to be the law in Michigan under the holding in *Keasey.* In that case a husband and wife made a joint will bequeathing and devising their property to the survivor of them and, upon the death of the survivor, specified portions thereof to their daughter-in-law. The husband died first and then the daughter-in-law. The wife then executed a codicil to the joint will revoking the legacy to the daughter-in-law and making new devises of the property therein mentioned. Suit was brought by the executor of the daughter-in-law's estate against the estate of the wife for specific performance of the contract between the husband and wife to make the joint will. Viewing the contract as supported by adequate consideration and therefore enforceable and irrevocable so as to entitle the daughter-in-law to specific performance had she survived the husband and wife, this Court nevertheless held that the most her representative could ask after her death is that the contract to make the joint will be enforced and that the most the court could decree would be that, at the surviving wife's death, the joint will be given effect as her will according to its provisions and legal import and, finally, that such legal import would be that the death of the daughter-in-law-legatee prior to the death of the testatrix caused the legacy to lapse. Plaintiff seeks to distinguish *Keasey* on the ground that there the daughter-in-law beneficiary gave no consideration for the contract while in the instant case Robert did. Had the consideration in *Keasey* moved from the daughter-in-law, the result, under the reasoning of this Court, would have been no different inasmuch as

this Court held in effect that the consideration moving between husband and wife in making the contract for the joint will was sufficient to support the contract and make it enforceable by the daughter-in-law third-party beneficiary had she survived the wife. While we do not consider it significant, it may be observed that the plaintiff in the case at bar is in no different position than was the daughter-in-law in *Keasey* in that the consideration moved from neither of them but from the promisee in the contract. The indicated distinction between the 2 cases is not controlling of a different result. It should be noted that this Court's decision in *Keasey* was announced 15 months before eminent counsel prepared the contract in the case at bar. He can scarcely have been unaware of its purport. Had it been the intent that plaintiff was to have the bequest if Robert predeceased Mary, it would have been simple for such counsel to have phrased the contract in terms leaving such intent clear and unmistakable. The fact that it was made to speak in terms of a will and bequest leads to the conclusion that the parties intended a simple legacy subject to the law of wills, including the possibility of lapse. It was competent for the parties to contract as they did. It is for us to determine their intent in so contracting and to give it effect. We do not find it to have been in accord with plaintiff's claim. Had the bequest been made as agreed, it would have lapsed. Not having been made, action will not lie for damages for breach of the agreement to make it, which, if kept, could not have benefited plaintiff.

The court properly excluded (1), as hearsay, testimony concerning what the attorney who drafted the contract had told the witness, some time after its execution and in the presence of Robert but absence of Mary, its meaning was, (2), as self-serving, an envelope on which Robert had written his interpre-

tation thereof, and (3), as equally within the knowledge of the deceased,* testimony of statements allegedly made by Mary to the witness while he was acting as attorney for the plaintiff and executor for Robert's estate when he asked her what she intended to do about carrying out her obligation to plaintiff under the provision of the contract here under consideration. Except for the self-serving writing, the excluded evidence had scant evidentiary value to establish the intent of the parties in executing the contract.

Plaintiff contends that the provisions of CL 1948, § 708.18 (Stat Ann 1943 Rev § 27.3178[428]), construed in *In re Booth's Estate,* 326 Mich 337, and in *In re Ford's Estate,* 339 Mich 339, as permitting the Court to require even a successful tardy claimant to pay referee's fees, ought not to be applied to plaintiff in this case because all the equities are so strongly in her favor. This is hardly persuasive in view of our holding against her.

The order should be affirmed, with costs to defendant.

CARR and KELLY, JJ., concurred with DETHMERS, C. J.

SMITH, J. The facts, stripped of nonessentials, are these: Robert C. J. Traub and William Traub had been in business together. After William died, dissension arose between his widow, Mary, and the surviving brother, Robert. Mary felt that the management of the store was at fault; that there should be more dividends, and that the business and some of the real estate should be sold. A compromise of differences was sought. Agreement (the one before us) was finally reached: Robert received certain

---

* See CL 1948, § 617.65 (Stat Ann § 27.914).—REPORTER.

assets, bonds and real estate. He gave up certain assets, including his interest in William's estate, worth approximately $86,000. Mary likewise received certain properties. The agreement also provided that "In consideration of the foregoing transfers and of the matters contained in this agreement" Mary would "forthwith" leave to Robert in her will all of her Traub company stock. He died without receiving the stock, having predeceased her. Robert's daughter, his sole heir, seeks it, or its value (it was sold before Mary's death) from Mary's estate. Recovery is opposed. The grounds will appear in due course.

We can see nothing here but a simple contract. Payment is resisted upon this ground: The agreement says merely that the stock is to go to Robert upon Mary's death. It does not say it is to go to his heirs or, indeed, to anyone else. It is argued, therefore, that the true intent is that it not go to Robert's heir-at-law but that the right thereto is personal to him and dies with him. Appellant asserts the intent was otherwise.

Was the omission in the agreement of apt reference to some other person to take in Robert's place, should he predecease Mary, an oversight, indeed, a blunder? We have difficulty with this assumption. It clashes with the careful thought evidenced within the four corners of the instrument, particularly since we find that the words "heirs, personal representatives and assigns" are used in the paragraph concerning indemnification against claims by creditors of William Traub's estate with respect to certain properties conveyed to Robert. The frequency with which the courts repeat that an indemnity contract is to be "strictly construed against him who claims to be an indemnitee" well justifies the precision in description employed in this paragraph. Here such words were meaningful and they

were thus utilized. But it is of the essence of the matter before us that the mere addition of the word "heirs" to a dispositive clause would have solved nothing with respect to our problem even had they been added. The words "to Robert and his heirs" are normally construed as words of limitation, not of purchase, *In re Martz's Estate,* 318 Mich 293. Their addition would have added nothing to the will clause under consideration.[1] They merely delimit the estate given and do not designate those who take by remainder.

There was a period in our law, all must agree, when "the word was the talisman." The law itself would imply nothing. Let individuals guard their own interests, was the philosophy, both as to contract and tort, and not come snivelling to the courts if they weren't sharp enough to look out for themselves. Thus it was not until *Slade's Case*[2] that the law itself would imply a promise to pay the debt defined in the action of debt, and similar in philosophy was Persay's argument in the time of Edward III[3] (1327–1377) that "I never heard that one should have a writ of covenant against executors, nor against other person but the very one who made the covenant, for a man cannot oblige another person to a covenant by his deed except him who was party to the covenant."

In modern times we read these cases with a curious eye, until such a case as the one before us arises. For here the argument is made that the omission by the draftsman of some word or words, exactly what words we are not told, means that Robert's rights to the stock for which he surrendered, among other things, an interest worth $86,000 in his broth-

---

[1] See, also, as to real property CL 1948, § 565.153 (Stat Ann 1953 Rev § 26.573).

[2] 4 Coke Rep 92b (76 Eng Rep 1074) (1602).

[3] YB 48 Ed III 2, pl 4, quoted in Holmes, The Common Law, p 345.

er's estate, runs only to "the very one who made the covenant" and he (Robert) being dead; his right to the return promised him, the consideration or its equivalent, goes to the grave with him. Of course it is theoretically possible for parties to make such a self-defeating agreement (and we will examine in due course the reasons advanced in support of such an agreement) but all presumptions of both reason and law are against such construction. As Cardozo put it, quoting an earlier case, "It is a presumption of law, in the absence of express words, that the parties to a contract intend to bind not only themselves, but their personal representatives," *Matter of Buccini* v. *Paterno Construction Co.*, 253 NY 256, 259 (170 NE 910), and this presumption extends not only to the obligation of contractual performance but the corresponding right to receive the consideration therefor, where not personal in nature.

Thus, if a lawyer sells his library for $5,000 to be paid to him within the year, we take it to be clear that his widow, 6 months hence, as sole heir-at-law, may collect the money even though the contract said not one word about payment to her. Nor do we regard the case as vastly different if the payment was to be by a "bequest" or a "legacy" in the purchaser's will, if it be clear only that the "bequest" or the "legacy" is the payment of the debt agreed upon in consideration of the library.* It has been many years since courts have allowed the garb of words to cloak the substance beneath, either converting the crafty to the cloth or investing the good with the attributes of evil. Actually what we have here is simply the payment of a debt.

---

* Such a bequest or legacy, if made, will not lapse in event the legatee predeceases the testator. See 4 Page, Wills (3d ed), § 1417, p 167: "A legacy which is given upon a valuable consideration, as in payment of a debt of testator's, does not lapse at common law."

The essence of this agreement with respect to the stock is thus clear on its face. Mary is to have a life interest therein, with the dividend advantages (in which she was primarily interested and which, in fact, was in large part responsible for the family dissension), and Robert is to receive the stock upon her death. But we are not without enlightenment in addition to the agreement itself. By way of preface we should say that in event of ambiguity in an instrument we make use of all possible aids in construction, the parol evidence rule to the contrary notwithstanding. 3 Corbin, Contracts, § 579, p 250, states the principle with clarity:

"As long as the court is aware that there may be doubt and ambiguity and uncertainty in the meaning and application of agreed language, it will welcome testimony as to antecedent agreements, communications, and other factors that may help to decide the issue."

In the contract before us we must conclude from the positions taken by the litigants that a real. and not a strained or fanciful, ambiguity existed. The understanding of the promisor, then, Mary Clark Traub, becomes significant. The agreement was hers, it had been executed by her, it had adjusted her differences with her brother-in-law Robert, and she had lived with it down through the years. What was her understanding of its content? How did she construe its requirements? The record on this is clear and will speak for itself. The incident narrated took place in the year 1945, some 12 years after the execution of the agreement:

"*Q.* Now, did you on any occasion overhear any statement by Mary Clark Traub as to the dividend policy of the company? Answer yes or no?
"*A.* Yes.

"*Q*. Will you tell us where and when you heard those statements made?

"*A*. On many occasions, and one which stands out in my mind with special vividness, was at the home of Robert Traub in Bloomfield Hills in the summer of 1945. Mrs. Traub took exception to the dividend policy of the company.

"*Q*. What people were present on that occasion?

"*A*. On this occasion Mr. and Mrs. Robert C. J. Traub were present; they were the hosts. Mrs. William H. Traub was there. I was there. I believe the daughter Barbara was there, but I am not sure.

"*Q*. Was this an evening occasion?

"*A*. This was a social occasion. We had stopped there to have a drink before going to the Bloomfield Hills Country Club for dinner. We withheld discussing jewelry business.

"*Q*. Will you relate what statements were made by Mrs. Mary Clark Traub on that occasion concerning the jewelry business?

"*A*. She complained vigorously that the company's dividend policy was niggardly, and she said that she was getting along in years, the stock wasn't doing her a great deal of good, and they should pay more dividends. She accused Robert Traub of building up the company by withholding dividends so that the stock would be more valuable when it came back to the Traubs.

"*The Court:* What was the date of this again?

"*A*. 1945. It was the summer of Hiroshima and the end of the war with Japan.

"*Q*. Anything else said by her on that occasion with respect to the dividend policy?

"*A*. When it was pointed out to her that dividends had to be paid out of earnings, that they might impair capital, she suggested that they get a bank loan in order to pay dividends; that she wasn't getting any younger and she resented the policy of building up, as she put it, building up the value of the stock so that it would be more valuable to the Traubs when it came back to them."

The identity of "the Traubs" referred to also is abundantly clear from the record, meaning Robert, and his daughter Barbara, whom the William Traubs, childless as they were, had regarded as the natural object of their affections. "I can't recall the exact words," the court was told, "but it was under-stood that she [Barbara] was to have their estate when they got through with it, because they had no children of their own."

. Testimony similar to Mary's, offered both as to the understanding of the scrivener, Peter J. Mona-ghan, Sr., and of the promisee, Robert C. J. Traub, of the meaning of the agreement, was excluded on the ground of hearsay. We will not let the exclusion pass without comment. Where the belief, under-standing, or intent of an actor is material, it is not objectionable to the hearsay rule that such mental state be established by either deed or word. In the latter event, the words are not received for their own testimonial trustworthiness but as proof of a state of mind. See McCormick, Evidence, § 268, p 567; 6 Wigmore, Evidence (3d ed), §§ 1729, 1790, pp 90, 237; Reed, What Is This Thing Called Hearsay? 36 MSBJ, No 3, March, 1957, p 20. We will not vex the issue further since the Monaghan and Robert Traub evidence, even if admissible, as to their be-lief, intent, and state of mind respecting the agree-ment, would be cumulative, only, to that of the prom-isor herself, Mary Traub, whose quoted testimony is clear and was received without objection.

As opposed, then, to the presumption of modern law that we have described in Cardozo's words, and to the understanding of the promisor herself, what do we find per contra? It is asserted that the intent of the parties was that only Robert, personally, was to be paid. So expressed we have a mere conclusion. Where do appellees find this asserted intent, so at variance with a man's natural instincts for the wel-

fare of the natural objects of his bounty, so dia-
metrically opposed to the presumption of law, so
contradictory of the promisor's belief that her stock
was to go "back to the Traubs"? First, after reciting
the controverted clause (Mary "agrees to forthwith
make a will bequeathing to Robert C. J. Traub all
of the shares of stock"), the appellees say "What
could be a more clear expression of an intent to
commit Mary Clark Traub to make only a simple
bequest to Robert C. J. Traub." Also, "No possible
intent can be found in the clearly expressed agree-
ment that would commit Mary Clark Traub to name
a substituted beneficiary in the event Robert C. J.
Traub predeceased her." These are exclamations
and expostulations, not reasons. Next, the presence
of words concerning "heirs" in the indemnity clause
is contrasted with their absence elsewhere in the
agreement. This we have already commented upon.
Finally, it is said, that since Robert was to have
"possession" of the stock at Mary's death, under
the terms of the contract, it meant that the stock
was intended only to go to him personally. This is
a complete *non sequitur*. Contracts for the sale of
chattels frequently provide that the purchaser may
take possession on a fixed date. This has never
(in modern times) formed, and cannot today form,
the basis for decision that a promisee's contract
rights die with him, upon the theory that after his
death he cannot "possess" anything, since we all
know that shrouds have no pockets. The above con-
stitutes the sum total of all that appellees can bring
to bear on the matter of the asserted "intent" that
Robert's rights should go to the grave with his re-
mains, much like a cause of action for personal in-
juries under ancient tort law. We must, therefore,
reject the appellees' distinction of such cases as
*Trower* v. *Young,* 40 Cal App2d 539 (105 P2d 160),
as differing from the case before us as to intent.

It is clear, of course, that where the contract involves the rendition of some service of a highly personal nature, such as the painting of a portrait, a different rule prevails. If the artist dies the promisee need not accept the work of another. But, even in such case, the death of the artist after he has furnished the portrait does not relieve the subject of the duty to pay his heirs. This, indeed, is the situation before us. Robert's consideration, including his relinquishment of his $86,000 interest in William's estate, had been furnished in full.

So much for the asserted "intent" that the stock would go only to Robert himself. But appellees have another string to their bow. A will was to be the "vehicle of transfer" of the stock and this, it is asserted, somehow changes Mary's obligations and Robert's rights. But the fact that a will was to be the means, the machinery,* so to speak, for getting the stock to Robert should not be allowed to defeat the basic agreement, if the will should fail in its purpose, or, indeed, never be executed. We might as well say that the death of a messenger relieves the obligor of the obligation the messenger was conveying to the obligee at the time of the messenger's death. Here the bargain made was for stock, not merely for a clause in a will. And, moreover, will Mary's obligation be deemed unenforceable by heirs-at-law if we call it a "bequest," though fully enforceable had we called it a "debt"? If so, we must deny its contractual origin and obligatory nature, deny the persistence of an unpaid debt, and thus glorify form at the expense of substance, reverting to medieval principles when the word was the law and the law was the word, when the only benefit came to the "very one" who made the covenant, when the ob-

* See Sparks, Legal Effect of Contracts to Devise or Bequeath Prior to the Death of the Promisor, 53 Mich L Rev 1, 33; also, Sparks, Contracts to Make Wills, 1956, pp 92, 93.

ligation itself was destroyed if the writing were destroyed, when a debtor could not be sued in debt unless he uttered the magic words of promise, for none would the law imply.

This is word-worship. To say that Mary's "sole commitment was to make a *bequest* to Robert C. J. Traub," as appellees do, is to obscure the issue before us. It relates to an obligation, not to a gift, not to a mere form of words. It can be discharged only by stock, not by words of bequest. To say, as appellees do, that Mary Traub was committed "to make only a simple bequest" is to say that a bequest clause per se was of the essence of the agreement. Since we all know that simple "bequest" clauses can be changed at will and that such bequests will lapse if the legatee predeceases the testator, Mary's obligation, under this theory, was slight indeed. The agreement made, that the bequest clause itself is of the essence of the agreement, is reminiscent of a suggested theory of consideration in the making of bilateral contracts, namely, that the mere making of the promise was what the promisee was after and once he got it he had received his consideration.[*] We have long since agreed, however, that the words of promise are not his consideration. They are merely a means of expression. The true consideration lies in the *thing* promised. This is the substance, not the empty verbiage mouthed by the promisor.[†] Nor, here, is it the clause in the will. Until Robert or his heirs receive the stock or its equivalent, whether by will or by Western Union messenger, the debt remains unpaid.

The essence of all of this is that consideration passed to Mary Clark Traub and it is too late in the

[*] See Ames, Two Theories of Consideration, 13 Harv L Rev 29 (1899).

[†] "Moving of the lips to speak or of the fingers to write is not what the promisor offers or the promisee accepts." Pollock, Principles of Contract (9th Eng ed, 1921), p 194.

law to maintain that she need not either return her bargained-for consideration or, if not available, its value. While it seems clear to us that under the terms of the contract itself the consideration in stock or its value must be paid in return to Robert, or his successors in right and interest, let us assume that through the operation of some rule of law the contract itself became unenforceable. Is the promisor now freed of the burden? Clearly not. There is merely a change in masters. The conscience now controls, and this is as true at law as in chancery. In such circumstances the contract is not the measure of the obligation but, rather, the obligation is the measure of the contract. Even under the English law of wills, relied upon by appellees (1 Jarman, Wills [8th ed, 1951], p 28), there will be no lapse if the "bequest" is in discharge of a moral obligation. 1 Jarman, *supra,* pp 438, 439.

The distinction to be drawn is that between a mere gift, a legacy or bequest in the gratuitous sense, and the payment of a debt for value received, used. and kept. The latter remains collectible despite its form, so long as unpaid. Here, then, we see the distinction between the case before us and many cases such as *Keasey* v. *Engles,* 259 Mich 178, thought to be controlling by appellees. The *Keasey Case* turned upon the determination by the Court that a gift was involved. The contract there under consideration (between husband, Leverett, and wife, Amanda) was that a gift should be made to a third person, named Emma. She was to receive it, however, as the Court is careful to explain (p 182), not *"in praesenti* at death of Leverett, with merely the right of enjoyment postponed, * * * but the gift itself was deferred until the death of Amanda." Since, however, Emma herself predeceased Amanda the Court held that "her legacy lapsed." If the essence of the contract, as the Court held, was to make a defeasible

gift, the donee Emma could not complain too per-
suasively to us that her gift was not broader in scope,
vested with a greater longevity. Her donors had
dealt her a bob-tailed flush and she could not fill
her hand through the operation of law. But the
essence of our case is not a narrowly-circumscribed
gift. It is a debt. The instrument is replete with
the concept of consideration, of exchange, of the
*quid pro quo*. We have no remote donee suing her
benefactor, but a promisee himself (in legal effect)
suing his promisor. It is the difference between
looking a gift horse in the mouth and demanding the
payment of an honest debt. As a matter of fact if
in the *Keasey Case* the promisor had been suing the
promisee, the Court's answer would have been clear.
The contract between promisor and promisee, says
the Court (p 181), "is irrevocable." And so, we hold,
is it here. In return for Mary's promise to convey
the stock to him at her death so that (in her own
words) it might go back to the Traub family, Robert
stripped himself, and his estate, of substantial assets.
It is both illegal and immoral that he, or his estate,
should not receive the bargained-for return. Sup-
porting Robert's claim we have not only the terms
of the agreement itself (and appellees have not
yet disclosed to us the magic words required in ad-
dition to those there placed by astute counsel) but
a presumption of law, unrebutted. Appellees, in-
deed, offered no testimony whatever. In addition
to all of this we have the wholly consistent under-
standing of the promisor herself. And opposed
thereto what? A chimerical "intent," supported only
by exclamation and expostulation. More is re-
quired, in this Court, to support a conclusion so
clearly opposed to the bargain made, a result so
obviously at variance with the most fundamental
considerations of justice.

We will not, it is to be hoped, emulate what Justice Holmes[1] described as "the inability of the seventeenth century common law to understand or accept a pleading that did not exclude every misinterpretation capable of occurring to intelligence fired with a desire to pervert."

ᵢ The judgment of the circuit court is reversed. The cause is remanded for the entry of judgment on the claim for $58,179, with interest and costs as by statute made and provided.[2] We will not substitute our discretion for that of the probate court imposing the burden of the referee's fee upon the tardy claimant,[3] appellant here.

BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred with SMITH, J.

---

[1] *Paraiso* v. *United States*, 207 US 368, 372 (28 S Ct 127, 52 L ed 249).

[2] See CL 1948, § 708.4 (Stat Ann 1943 Rev § 27.3178 [414]).—RE-PORTER.

[3] See CL 1948, § 708.18 (Stat Ann 1943 Rev § 27.3178 [428]).—RE-PORTER.